# United States District Court
# For the Central District of Illinois

| | |
|---|---|
| **Anthony Rodesky**, <br><br> Plaintiff. <br><br> v. <br><br> **Wexford Health Source, Incorporated**; **Dr. Marvin Powers**, in his individual capacity; **Dr. Andrew Tilden**, in his individual capacity; **Randy Pfister**, in his individual and official capacity as Warden of Pontiac Correctional Center, **Dr. Louis Shicker**, in his official capacity as Medical Director of the Illinois Department of Corrections, and **Salvador Godinez**, in his official capacity as Director of the Illinois Department of Corrections. <br><br> Defendants. | No. |

## COMPLAINT

Anthony Rodesky, through his attorney, Alan Mills of the Uptown People's Law Center, as his complaint against Wexford Health Sources, Incorporated ("Wexford"), Dr. Marvin Powers, Dr. Andrew Tilden, Randy Pfister, Dr. Louis Shicker, and Salvador Godinez states as follows:

### Nature of the Case

1. Mr. Anthony Rodesky is an insulin dependant diabetic that has lost most of his left heel, including areas of bone, due to infected ulcers that initially

developed because Dr. Marvin Powers, the medical director at Tamms Correctional Center, denied him diabetic shoes. The ulcers became progressively worse due to the deliberate indifference of Dr. Powers and Dr. Andrew Tilden, the medical director at Pontiac Correctional Center. Both Drs. Tilden and Powers were employed by Wexford. As a result of defendants' misconduct, Mr. Rodesky has experienced excruciating pain over the last three years and has undergone numerous invasive surgeries each of which was required to remove necrotic tissue from his foot. As a result, Mr. Rodesky has suffered permanent loss of a portion of his heel. His ulcers remain perpetually infected and his doctors have continued to improperly treat his serious medical needs. He remains at risk of losing his entire left foot.

## Jurisdiction and Venue

2. This court has jurisdiction over this case under 28 U.S.C. §1343 and §1331, as plaintiff's claims arise under 42 U.S.C. §1983, the Americans with Disabilities Act and the Rehabilitation Act.

3. Venue is proper in the Central District of Illinois under 28 U.S.C. § 1391 because at least one of the defendants resides in the Central District and a portion of the events at issue occurred in the Central District.

## Facts Common to All Counts

### Parties

4. Prior to September, 2005, Mr. Rodesky had been confined in the New Jersey State prison system.

5. In September, 2005, Mr. Rodesky was transferred to Illinois pursuant to an Interstate Compact agreement between Illinois and New Jersey. Since September, 2005, Mr. Rodesky has been continuously housed in prisons operated by the Illinois Department of Corrections ("the Department").

6. Wexford Health Sources, Incorporated ("Wexford") is (upon information and belief) a corporation formed and operating under the laws of the State of Florida, with its principle place of business located in Pittsburg, Pennsylvania.

7. At all relevant times, Wexford had a contract with the Illinois Department of Corrections to provide medical care to all prisoners housed in Illinois' prisons.

8. From September 2005 to January 2013, Dr. Marvin Powers was employed by Wexford as the medical director at Tamms Correctional Center where he oversaw medical care provided to all prisoners at Tamms Correctional Center, and personally provided primary medical care to Mr. Rodesky.

9. From January 2013 to the present, Dr. Andrew Tilden was employed by Wexford as the medical director at Pontiac Correctional Center where he oversaw medical care provided to all prisoners at Pontiac Correctional Center, and personally provided primary medical care to Mr. Rodesky.

10. Randy Pfister is the warden at Pontiac Correctional Center, where Mr. Rodesky was assigned to a top tier cell. He is sued in both his individual and official capacity.

11. Dr. Louis Shecker is the medical Director of the Illinois Department of Corrections, responsible for overseeing medical care provided to all prisoners housed in Illinois' prisons. Dr. Shecker is sued in his official capacity only.

12. Salvador Godinez is the Director of the Illinois Department of Corrections ("the Department"), responsible for the overall operation of the Department. Director Godinez is sued in his official capacity only.

## Facts

13. Upon his arrival in Illinois, Mr. Rodesky was immediately placed in Tamms Correctional Center, at that time Illinois' "supermax" prison.

14. In Tamms, Mr. Rodesky was diagnosed with diabetes and after 6 months of treatment via oral medication, was put on insulin injections.

15. Mr. Rodesky has poor circulation in his feet because of his diabetes. Prior to the events at issue in this case, he had managed this complication by wearing commissary-purchased gym shoes while in IDOC.

16. During a routine shake down of his cell in August 2011, a prison guard confiscated Mr. Rodesky's gym shoes because he alleged that Mr. Rodesky had a paperclip in one of his shoes. Tamms officials did not provide him with a new pair of gym shoes. Instead, Mr. Rodesky was forced to either go barefoot or wear slip-on canvass shoes with thin soles that were not the correct size.

17. After a few days wearing the canvass shoes, Mr. Rodesky noticed several blisters had formed on his right foot with a dark liquid leaking out of the sores.

18. Mr. Rodesky utilized the proper procedures at Tamms to seek medical treatment for his foot.

19. Dr. Powers, the medical director at Tamms, prescribed ointment and seven days of antibiotics.

20. Over the following months, Mr. Rodesky's foot grew significantly worse, with pink and purple colored sores growing larger than a quarter in size. One of the quarter-sized sores developed into a large, one-inch deep ulcer.

21. During these months, Mr. Rodesky had no way to treat his open sores because he did not have access to band-aids or gauze to cover the sores after cleaning them. Rather, Mr. Rodesky was entirely dependent on Dr. Powers to prescribe treatment.

22. Dr. Powers never issued a medical order for Mr. Rodesky to have band-aids, medical dressings, or disinfectant materials for his sores nor did he order diabetic shoes for Mr. Rodesky.

23. In October 2011, Mr. Rodesky finally received some band-aids, but the sores had become so infected that his socks stuck to the discharge leaking from the open sores. The wet discharge prevented the band-aids from adhering to his sores.

24. In early November 2011, the warden at Tamms denied Mr. Rodesky's emergency grievance and stated that: "the offender's request for medical shoes will be discussed by Dr. Powers, and the Wexford Medical Director."

25. Instead of prescribing diabetic shoes, Dr. Powers prescribed plastic shower shoes for Mr. Rodesky to wear during his daily routine. Mr. Rodesky soon could not stand or walk without excruciating pain because his feet kept cracking open and bleeding.

26. In late November 2011, Mr. Rodesky was moved to the infirmary for treatment of his sores. He spent over a month in the infirmary. The ulcer on Mr. Rodesky's foot soon exploded, emitting a foul stench and yellow discharge each time his wound was uncovered. Mr. Rodesky's foot continued to grow worse, with increased redness, irritation, and swelling around each sore.

27. In early 2012, the ulcer had expanded and eaten away at a portion of the bottom of Mr. Rodesky's foot. At that point, Dr. Powers and Wexford finally approved consultation with an outside doctor.

28. In February 2012, an outside doctor performed emergency surgery on Mr. Rodesky's foot. He cut out the infected area, which by then had grown and was one-and-half inches deep.

29. Following surgery, the outside doctor prescribed antibiotics, pain medications, and ordered the prison medical staff to redress the open wound three times each day. The outside doctor also ordered that Mr. Rodesky wear

special "after surgery" shoes, similar to diabetic shoes, that would keep his wound from becoming infected and compression stockings.

30. Dr. Powers did not order Mr. Rodesky "after surgery" shoes and informed Mr. Rodesky that Wexford would take weeks to approve special diabetic shoes. It took 2 months for Mr. Rodesky to receive the compression stockings. Dr. Powers failed to prescribe the antibiotics ordered by the outside surgeon, and only prescribed Motrin to alleviate Mr. Rodesky's pain.

31. In August 2012, an ulcer developed on the top or Mr. Rodesky's right foot.

32. At the same time, the heel of his right foot (where the surgery had been preformed) continued to leak a yellowish discharge.

33. When he was returned to an outside doctor, Mr. Rodesky was told that without additional surgery, he would lose his foot. Shortly thereafter, the outside doctor again performed surgery to cut away additional infected tissue.

34. Following this second surgery, the outside doctor ordered a wound vacuum for Mr. Rodesky's foot and ordered that he be confined to bed in the infirmary unit of Tamms.

35. Dr. Powers did admit Mr. Rodesky to the Tamms infirmary, where he was confined to a bed for many weeks. Wexford did not, however, approve a wound vac.

36. During the weeks Mr. Rodesky was confined to the infirmary, Dr. Powers enforced the bed rest order in a malicious manner by not allowing Mr.

Rodesky to shower during these weeks. Dr. Powers also refused to remove the PICC line inserted in Mr. Rodesky.

37. Dr. Powers also ordered a nurse to wrap "evidence tape" around the outside of Mr. Rodesky's foot, not for any medical reason, but rather to humiliate him as punishment for Mr. Rodesky's repeated complaints about his treatment. Dr. Powers further threatened to four point strap Mr. Rodesky to his bed if the tape appeared to be tampered with.

38. After his confinement in the infirmary, Dr. Powers refused to prescribe (or in the alternative Wexford refused to approve) physical therapy against recommendations from the outside doctors. The physical therapy was time-sensitive and would have only been effective if Mr. Rodesky received it soon after his wound had finished healing. Mr. Rodesky had continuous pain in his foot because of scar tissue that built up after his treatment in the infirmary wing.

39. When Tamms closed in December 2012, Mr. Rodesky was transferred to Pontiac Correctional Center.

40. On his arrival at Pontiac, Mr. Rodesky was assigned to a cell in 6 gallery and was later moved to a cell on 8 gallery, rather than a lower cell. To receive his insulin shots twice a day, he had to climb up and down the stairs, which caused him excruciating pain. All this climbing reopened his newly healed wounds and his foot again became infected.

41. In February or March of 2013, Dr. Tilden issued a medical order to move Mr. Rodesky to a lower bunk in a lower gallery cell. Mr. Rodesky was not assigned to a lower gallery until May 2013.

42. During Mr. Rodesky's initial visit with Dr. Tilden, the medical director at Pontiac, Dr. Tilden ordered Mr. Rodesky to soak his feet three times a day. According to generally accepted medical practice, soaking foot ulcers can easily lead to maceration of the skin and can worsen the infection. Dr. Tilden additionally ordered that Mr. Rodesky's foot be soaked in iodine, to which Mr. Rodesky is allergic.

43. In early 2013, Mr. Rodesky's ulcers had again become worse, and portions of his heel had again become necrotic, forcing him to undergo a third surgery on his foot, this time at the University of Illinois—Chicago Hospital.

44. Dr. Tilden refused to administer the pain medication prescribed by the University of Illinois—Chicago Hospital to alleviate the pain from Mr. Rodesky's heel surgery.

45. Mr. Rodesky continued to suffer without pain medication through summer 2013 while recovering from surgery.

46. In October 2013, Mr. Rodesky underwent another debridement in his heel at the University of Illinois – Chicago Hospital.

47. In January 2014, Mr. Rodesky underwent another debridement at University of Illinois – Chicago Hospital. The biopsy found that his bone was

infected and the orthopedic surgeon requested that he be scheduled for surgery.

48. Finally, in May 2014, after being admitted for gangrene, Mr. Rodesky underwent surgery at University of Illinois – Chicago Hospital, during which a portion of his heel bone was removed and antibiotic beads were implanted.

49. In June 2014, at University of Illinois – Chicago Hospital, Mr. Rodesky's heel was injected with liquid cadaver tissue and a skin graft was placed over his wound.

50. The treating doctors at University of Illinois – Chicago Hospital wanted to see him for a follow-up visit, but as of the date of filing, no such appointment has been made.

51. Dr. Tilden continues to refuse to administer the pain medication prescribed by the University of Illinois—Chicago Hospital to alleviate the pain from Mr. Rodesky's heel surgery and Mr. Rodesky continues to receive improper treatment of his diabetes.

52. Mr. Rodesky still suffers from infected ulcers and is still not receiving proper treatment as prescribed by his outside surgeon and foot specialists. He will likely lose his entire foot if Dr. Tilden fails to control the infection and otherwise provide proper treatment for Mr. Rodesky's condition.

## Count One
(Eighth Amendment—Deliberate Indifference to Serious Medical Need)

53. Under the Eighth amendment, prison authorities must provide medical care to prisoners, who rely entirely on the prison system for their medical needs.

54. Dr. Powers had personal knowledge of the infection in Mr. Rodesky's foot but did not take the required steps to treat his serious medical condition.

55. Dr. Powers showed deliberate indifference to Mr. Rodesky's serious medical condition by, among other acts and omissions:

    A) failing to prescribe him diabetic or special post—surgical shoes;

    B) denying him the medical supplies necessary for keeping the sores clean;

    C) failing to prescribe sufficient antibiotics to control the infection; not cleaning his wounds multiple times each day; and

    D) refusing to order physical therapy after Mr. Rodesky's first surgery.

56. Dr. Tilden had personal knowledge of the infection in Mr. Rodesky's foot but did not take the required steps to treat his serious medical condition.

57. Dr. Tilden showed deliberate indifference to Mr. Rodesky's serious medical condition by, among other acts and omissions:

    A) ordering Mr. Rodesky to soak his feet three times a day;

    B) failing to prescribe him diabetic shoes;

    C) not cleaning his wounds multiple times each day; and

    D) refusing to administer pain medication prescribed by outside doctors.

58. Wexford had actual knowledge of the infection in Mr. Rodesky's foot but did not take the required steps to treat his serious medical condition.

59. Upon information and belief, Wexford was deliberately indifferent to Mr. Rodesky's serious medical condition by, among other acts and omissions:

    A) refusing to timely approve surgery for Mr. Rodesky's foot;

    B) refusing to timely approve a vac boot following Mr. Rodesky's surgery;

    C) refusing to timely approve diebetic or special post—surgical shoes for Mr. Rodesky;

    D) refusing to timely provide compression stocking for Mr. Rodesky;

    E) otherwise refusing to approve timely consultations and follow-up exams with outside experts needed to properly treat Mr. Rodesky.

60. Upon information and belief, Dr. Shicker became aware of Mr. Rodesky's medical issues when Wexford refused to authorize various treatments for Mr. Rodesky.

61. Pursuant to the contract between Wexford and Illinois, Dr. Shicker, as the Illinois Medical Director, is notified whenever Wexford denies a request for outside treatment. In addition, the response to at least one of Mr. Rodesky's grievances indicated that his medical concerns would be reviewed by the Medical Director.

62. Despite his actual knowledge of the unnecessary pain and suffering inflicted on Mr. Rodesky, Dr. Shicker took no action to ensure that Mr. Rodesky was properly treated.

63. Warden Pfister had actual knowledge of Mr. Rodesky's medical issues, as a result of personal conversations with Mr. Rodesky, as well as (upon information and belief) through the grievance process.

64. Despite his actual knowledge of Mr. Rodesky's medical issues, Warden Pfister either assigned Mr. Rodesky to a high tier cell, or refused to change that assignement once he became aware of Mr. Rodesky's condition.

65. As a result of being assigned a high tier, Mr. Rodesky suffered agonizing pain every time he had to leave his cell and travel; to the doctor, to visits, or for any purpose which required him to go up or down the stairs.

**WHEREFORE,** Mr. Rodesky requests that judgment be entered in his favor against each of the defendants jointly and severally and

    A. compensatory damages be awarded against defendants Wexford, Powers and Tilden;

    B. punitive damages be awarded against defendants Wexford, Powers and Tilden;

    C. an injunction be entered against defendants Godinez and Shicker in their official capacities requiring proper medical treatment for Mr. Rodesky's serious medical condition; and

    D. award attorneys fees and costs pursuant to 42 U.S.C. §1988.

## Count Two
(Respondeat Superior)

66. Wexford was responsible for employing and overseeing medical directors and other medical staff at Tamms and Pontiac.

67. Dr. Power and Dr. Tilden were both medical directors employed by Wexford and prescribed treatment for Mr. Rodesky.

68. All of the actions and omissions of Drs. Powers and Tilden were done as a part of their employment by Wexford.

69. Wexford is therefore responsible for the injuries caused by the conduct of Drs. Powers and Tilden under the doctrine of *responeat superior*.[1]

**WHEREFORE,** Mr. Rodesky requests that judgment be entered in his favor against Wexford and compensatory and punitive damages be awarded to him, and attorneys fees awarded pursuant to 42 USC §1988..

### Count Three
Violation of the Americans With Disabilities Act
(vs. Director Godinez)

70. On July 12, 1990, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

71. The Department is a public entity, as departments, agencies, special purpose districts, or other instrumentalities of the State of Illinois, as defined in 42 U.S.C. § 12131(1).

72. Mr. Rodesky, at all times relevant to this complaint, was a qualified individual with a disability within the meaning of Title II of the ADA, 42

---

[1] Pursuant to Rule 11 of the Federal Rules of Civil Procedure, plaintiff acknowledges that this claim is not established by existing law, but counsel has a good faith argument for extending existing law, as recognized in *Shields v. Illinois Department of Corrections*, 746 F.3d 782 (7th Cir. 2014).

14

U.S.C. § 12131(2), and had a right not to be subjected to discrimination on the basis of his disability by the Department. 42 U.S.C. § 12132.

73. Individuals in the custody of the Department such as Mr. Rodesky are wholly dependent on the Department for medical care and accommodation, among other services. Individuals in the custody of Department are also dependent on the Department and prison staff for all of their basic daily needs, including food, exercise, and safety.

74. Under the ADA, 42 U.S.C. § 12132, and 28 C.F.R. § 35.130(a), IDOC must ensure that individuals in its custody are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities because of their disability.

75. The Department's refusal to assign Mr. Rodesky to a low tier at Pontiac Correctional Center, and its requirement that he walk up and down multiple flights of stairs each day to receive his insulin shots failed to accommodate Mr. Rodesky's disability.

76. As a result of the Department's wrongful conduct, Mr. Rodesky's medical condition was greatly exacerbated, and he was subjected to unnecessary pain and suffering.

**WHEREFORE**, Mr. Rodesky requests that judgment be entered against Director Godinez in his official capacity, and that he be awarded damages and that an injunction enter requiring accommodation of Mr. Rodesky's disability, and awarded attorney fees pursuant to the ADA.

## Count Four
Violation of the Rehabilitation Act
(vs. Director Godinez)

77. The purpose of the Rehabilitation Act is to ensure that no "qualified individual with a disability in the United States . . . shall, solely by reason of [ ] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

78. Mr. Rodesky is a qualified individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(2), and has a right not to be subjected to discrimination on the basis of his disability. 29 U.S.C. § 794(a).

79. The Department receives Federal financial assistance within the meaning of 29 U.S.C. § 794(a).

80. The Department constitutes "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(1)(A)-(B) and/or (b)(2)(B) and was required to comply with the Rehabilitation Act.

81. The Department's refusal to assign Mr. Rodesky to a low tier at Pontiac Correctional Center, and its requirement that he walk up and down multiple flights of stairs each day to receive his insulin shots failed to accommodate Mr. Rodesky's disability.

82. As a result of the Department's wrongful conduct, Mr. Rodesky's medical condition was greatly exacerbated, and he was subjected to unnecessary pain and suffering

**WHEREFORE**, Mr. Rodesky requests that judgment be entered against Director Godinez in his official capacity, and that he be awarded damages and that an injunction enter requiring accommodation of Mr. Rodesky's disability and be awarded attorney fees pursuant to the Rehabilitation Act..

        Respectfully submitted,

        <u>s.Alan Mills</u>
        One of the attorneys for plaintiff

Alan Mills
Uptown People's Law Center
4413 North Sheridan
Chicago, Illinois 60640
(773) 769-1411