IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

ANTHONY RODESKY, )
          Plaintiff, )
          v. ) Case No. 15-cv-1002-JEH
WEXFORD HEALTH SOURCE INC., et al., )
          Defendants. )

## DECLARATION OF EVAN L. KAHN, M.D.

1. I am an adult over 18 years of age and have personal knowledge of the facts stated in this declaration.

2. I have been retained an as expert in this case. In that capacity, I have prepared a report, dated March 19, 2019, and given testimony.

3. A copy of my March 19, 2019 report is attached to this declaration as Exhibit A. The contents of this are all true and accurate to the best of my knowledge, information, and belief. I hold the opinions set forth in this report to a reasonable degree of medical certainty.

4. A copy of my C.V. is also attached to my report.

I declare, under penalty of perjury that the foregoing is true and correct.

Dated 2/13/20

_____
Evan L. Kahn, M.D.

March 19th, 2019

Uptown People's Law Center
4413 N. Sheridan
Chicago, IL 60640

Dear Elizabeth Mazur,

      Per your request, I have reviewed the medical records for patient Anthony Rodesky provided by your office in respect to his diabetic management and care during the time period of July 2011 to July 2015. A list of the records you provided for my review with reference to Bates number is attached to this report as Exhibit A. During this time period, Mr. Rodesky was under physician care and management of his general health maintenance including specific regard to the management of his pre-existing diagnosis of diabetes mellitus.

      I present myself as a Board Certified Emergency Physician licensed to practice medicine in Illinois in all of its branches. I currently practice as an attending physician in Illinois and I also serve as an assistant professor of medicine and resident physician instructor. As per my training and current practice responsibilities, I have treated multiple patients with diabetic complications and evaluate patients on a routine basis for such complications including diabetic ulcerations. A copy of my current CV attached to this report as Exhibit B. My fees for this case are $250 per hour for document review and report preparation and $500 per hour for testimony.

      The following report sets forth the numerous ways in which I feel that Mr. Rodesky's case has deviated from the established standard of care, and the manner in which those deviations have proximately caused, contributed to, and/or increased the risk of his infections and ultimate right lower extremity below the knee amputation. All of the opinions set forth in this report are held to a reasonable degree of medical certainty. In preparing this report, I relied on my education, training, and experience as a physician and materials set forth in Exhibit A.

      While specific reference to the medical records will be provided below, per the records available for review, Mr. Rodesky had reported a blister to his right foot as early as 8/22/11. On review, Mr. Rodesky had continued to raise concern for this blister including reporting on multiple occasions that he felt that his wound was worsening. Specifically, Mr. Rodesky is documented in the records reporting worsening of pain, swelling, and discharge from this wound site. Medical records from 9/4/11 document his concern for worsening of his condition as well as documentation of signs suspicious of evolving infection to the site.

      During this time frame, Mr. Rodesky was evaluated on a daily basis in regards to his diabetes including blood glucose monitoring and insulin administration. Despite this daily surveillance, the medical records show that Mr. Rodesky would continue to report concern for worsening of this blister/ulceration to his medical care providers.

      As noted throughout my report, it is my opinion that the healthcare providers who treated Mr. Rodesky between 2011 and 2015, deviated from the standard of care in many respects. Specifically, the providers deviated from the standard of care as follows:

Kahn Declaration Exhibit A

1) Mr. Rodesky has an initial report of blister/skin violation to the plantar aspect of his right foot on 8/22/11.  Initially, Mr. Rodesky's documented care plan consisted of topical antibiotic medication and continued surveillance of the wound.  Despite Mr. Rodesky's continued complaint of worsening of his wound (as evidenced by increasing pain, redness, swelling, and drainage) as well as documentation of these findings (9/4/11, 9/7/11, 9/28/11, 9/30/11) there was no alteration of the plan of care. It was not until 10/6/11 that oral antibiotics were initiated (Doxycycline 100mg twice a day for one week). It is my opinion that this delay in initial care modification directly contributed to the worsening of his ulceration and ultimate infection.  IDOC's own diabetes treatment guidelines says "special attention should be given to management of foot ulcers, which should be treated aggressively until healed."  I agree this treatment guideline.  In this manner, the term 'aggressively' is often used to relate the urgency of timely responses when these wounds are identified.  Prompt and decisive action is key as the diabetic patient is especially vulnerable to infections and the complications that are associated with such infections.
2) As per the Tamms Correctional Center protocol, labeled "Nurse/CMT TX Protocols: Blisters" (Bates 28), the document indicated escalation of the case to his medical doctor "If there are signs of infection (redness, warmth, discharge)".  Per the documentation, 21 days had passed between the time that Mr. Rodesky had initially reported the ulceration as this protocol is dated 9/7/11.
3) I find that the documentation prepared by medical staff is lacking in both substance and objective documentation. As early as 8/26/11, it is documented that Mr. Rodesky "showed this nurse sole of right foot. He had a blister that opened up on ball of the foot". However, on his repeated evaluations, this blister was not documented per the objective nor subjective portion of the SOAP note. It is not until 9/4/11 that I find mention of this finding and at that point is documented as "…my [Mr. Rodesky's] toe was purple and twice the size it normally is. I squeezed on it and a bunch of really dark red blood come [sic] out of it. It smelled bad too".  The objective portion of the note identifies "#2 toe on right foot red and slightly swollen".  Documented in the assessment portion of the note indicates "possible infection of above mentioned toe".  During his daily diabetic evaluations, there is no mention of this ulceration nor mention of the progression of this wound in the majority of his visits.  Diabetic ulcers on the feet require continuous monitoring and careful documentation of objective findings including, but not limited to, size of the wound and detailed specifics of the wound including redness, necrotic tissue, local swelling, and possible drainage.  Early identification, close surveillance with detailed findings, and escalation of treatment are fundamental in the standard of care for these types of ulcerations. Without proper documentation of the progress of the wound, it is my opinion that close monitoring of this ulceration would have been impossible for the attending doctor, and thus that doctor would not have the information needed to implement proper aggressive treatment of Mr. Rodesky's ulcerated blister. The physician overseeing Mr. Rodesky's care should have ensured proper documentation of Mr. Rodesky's wound so that he could closely monitor its progression.
4) The failure to provide regular detailed assessments to the attending doctor, and the doctors' resultant failure to engage in continual reevaluation of the effectiveness of existing treatments, continued throughout the relevant period.
5) For example, during the time period of 2011 to 2015, covering both his time at Tamms Correctional Center and his subsequent incarceration at Pontiac Correctional Center, Mr. Rodesky was placed on multiple antibiotic regiments without apparent documentation as to

the rational as to both the choice of antibiotic(s) as well as medical decision making regarding any changes in this plan.  Initially, Mr. Rodesky was placed on topical antibiotics only and despite worsening of his ulceration, these topical medications were continued. After Mr. Rodesky was eventually started on oral antibiotics, this plan changed multiple times and the indication for these changes are never documented in the medical records. While Mr. Rodesky's doctors may have had some plan in mind, from what they documented in his medical file, it appears that these changes were made randomly, without regard to the severity of Mr. Rodesky's infections. As a result of the failure to properly document their decision-making, it is difficult to determine if his worsening condition was due to antibiotic failure, resistance, intolerance of the medication, missed dosing, etc.  Documentation of medical decision making is essential to any patient care plan. Without this information, there is no ability to understand the treatment rationale and subsequently, what specific alterations in the care plan this may represent.  Specifically, I refer to the following examples
  a.  12/21/11: Bactrim DS twice a day for 10 days started
  b.  1/24/12: Levaquin 500mg started
  c.  3/3/12: Doxycycline was added back to the MAR
  d.  3/13/12: Zyvox 600mg for 10 days started
  e.  3/14/12: oral medication Zyvox replaced with IV Vancomycin
  f.  9/26/12: per call from Dr. Dickerson's office, Mr. Rodesky was recommended to start Ciprofloxacin due to results from recent wound culture (e. coli).
  g.  4/3/13: Ciprofloxacin 10 day course started
  h.  6/5/13: Bactrim DS for 15 days as well as Minocycline for 10 days added
  i.  10/18/13: Bactrim DS for 7 days
  j.  3/13/14: Ciprofloxacin for 7 days restarted
  k.  4/11/14: Minocycline restarted
  l.  5/6/14: Minocycline for 10 days and Bactrim DS for 7 days restarted
  m.  5/13/14: IV Aztreonam started
  n.  5/14/14: IV Aztreonam replaced by IV Ceftazidime
  o.  5/15/14: IV Ceftazidime replaced by Aztreonam
  p.  6/26/14: IV Aztreonam for 5 days restarted
  q.  7/16/14: Clindamycin for 10 days added
  r.  5/3/15: IV Vancomycin and Aztreonam for 42 days
6) In addition to multiple antibiotic rotations and adjustments without clear indication or documentation of medical decision making, I also identify a pattern of escalation of Mr. Rodesky's pain medication. However, the documentation provided during the time period of 2011-2015 frequently makes no mention of his pain or appears to document that he is without pain.  This information does not appear to be consistent with the escalation of pain medication prescribed in order to address Mr. Rodesky's discomfort. In my opinion, this failure of documentation is yet another example of the failure to closely monitor and record Mr. Rodesky's progress (or lack thereof).
7) A patient's pain level is a factor (among multiple others) in assessing whether an ulceration is improving (responding to treatment) or becoming worse. In Mr. Rodesky's case, it is my opinion that the increases in pain medication indicate that the doctor was aware of the clinical worsening condition of Mr. Rodesky's ulceration.  While the potency of one narcotic compared to another is a topic of discussion and does not necessarily reflect more aggressive pain management, I feel that the overall pattern of rotating multiple pain medications does reflect a worsening of his condition.  I refer to the medical records in regards to the following:

      a. 8/22/11: No mention of any pain medications
      b. 1/26/12: Mr. Rodesky requests Tylenol for pain
      c. 1/31/12: Tylenol replaced by Tylenol #3 (narcotic formulation with Tylenol)
      d. 2/7/12: Lortab (narcotic) for pain
      e. 2/21/12: Nubain (narcotic) in addition to Lortab (narcotic)
      f. 7/24/12: Norco (narcotic)
      g. 5/24/13: Ultram and Tylenol #3
      h. 7/24/15: Tylenol #3, Gabapentin, MS Contin (narcotic)

8) During Mr. Rodesky's admissions to the infirmary, there are multiple omissions of vital signs and other key information. As per the medical records from the infirmity, these omissions are documented as "n/a" [not available] or 'refused by patient'. While it is possible that Mr. Rodesky had refused vital signs and other objective measurement during his multiple stays in the infirmary, there does not appear to be any documentation indicating his refusal to cooperate with his care providers and I believe that it is reasonable to conclude at this time that Mr. Rodesky requested help for his ulceration and that a reasonable individual would desire improvement in his pain and suffering. I refer to the following infirmary documentation with dates ranging from 1/25/12 – 4/21/12 [Bates 909 – 926].

9) The records show that Mr. Rodesky's foot ulcer was almost fully healed when he left Tamms in December 2012, but the ulcer came back in 2013 soon after he arrived at Pontiac and became progressively worse until 2014. While any ulceration in a diabetic patient presents a medical challenge, it is my opinion that Mr. Rodesky's case has already demonstrated a complicated course and therefore, I would expect his medical team to heighten their wound surveillance and care plan. I feel that this was not the case, as mentioned above.

10) Mr. Rodesky's foot ulcer was on the bottom of his foot. Without specific mention or identification of the correctional unit's policies and procedures on such matters, supportive and well fitting footwear as well as appropriate time to rest are key ancillary measures in diabetic wound healing.

11) Mr. Rodesky was admitted to the Pontiac infirmary from approximately April 2014 to September 2014 while he underwent outside treatment for his foot ulcer at UIC. After this course of treatment, Mr. Rodesky's foot ulcer healed and he was able to ambulate. However, by 12/11/14, he was complaining of pain and bleeding to his feet. Again, I find his clinical team did not demonstrate recognition of these warning signs and, as such, did not respond in the timely and aggressive manner that was both indicated as well as required in this case.

    It is further my opinion, to a reasonable degree of medical certainty, that the above deviations from the standard of care proximately caused and contributed to Mr. Rodesky's ultimate need for an amputation of his right leg. I feel that these deviations present a delay in overall care and that the medical documentation does not meet satisfactory criteria in order to properly create a plan of care and to adjust that plan of care as the patient's presentation and condition has changed. Diabetic ulcerations are a significant source of morbidity and mortality to the diabetic patient. The cases are defined by the need for close observation and documentation as well as aggressive management at the onset of infection or worsening. While all treatments need to be tailored to the individual patient and clinical presentation, management of diabetic ulcerations require particular attention to these details.

    Finally, it is my opinion that the following publications (also listed in Exhibit A) are reliable medical authorities, treatises, or pamphlets on the treatment of diabetes:

- American Diabetes Association, Diabetes Management in Correctional Institutions (2010) & (2008) (Rodesky 470-483)
- American Diabetes Association, Standards of Medical Care in Diabetes (2018) (Rodesky 484-655)
- Infectious Disease Society of America, Clinical Practice Guideline for Diagnosis and Treatment of Diabetic Foot Infections (2012) (Rodesky 155-196)
- U.S. Health Resources & Services Administration, Lower Extremity Amputation Prevention (2013) (Rodesky 439-447)
- American Podiatric Medical Association, Diabetic Wound Care (Rodesky 3412-3418)

/s/evankahn
Evan L. Kahn M.D.

Exhibit A

- IDOC medical records (IDOC Bates 1-6619)
- UIC medical records
- Deposition of Dr. Powers (two parts)
- Deposition of Dr. Tilden
- Deposition of Dr. Dickinson
- IDOC Diabetic Treatment Guidelines (May 2015) (IDOC Bates 4717-4723)
- American Diabetes Association, Diabetes Management in Correctional Institutions (2010) & (2008) (Rodesky 470-483)
- American Diabetes Association, Standards of Medical Care in Diabetes (2018) (Rodesky 484-655)
- Infectious Disease Society of America, Clinical Practice Guideline for Diagnosis and Treatment of Diabetic Foot Infections (2012) (Rodesky 155-196)
- U.S. Health Resources & Services Administration, Lower Extremity Amputation Prevention (2013) (Rodesky 439-447)
- American Podiatric Medical Association, Diabetic Wound Care (Rodesky 3412-3418)

Kahn Declaration Exhibit A

# EVAN L. KAHN M.D. F.A.C.E.P

2442 N Southport Ave Unit 3N
Chicago, IL 60614
Tel: 773-848-9332
Email: ekahn.mail@gmail.com

## WORK HISTORY

**Oct 2015 to Present**
**Attending Emergency Physician**
*Advocate Illinois Masonic Medical Center*
*Chicago, IL 60657*

Employed as emergency medicine physician and associate professor for the University of Illinois at Chicago emergency medicine residency program.

**Jul 2013 to Jul 2015**
**Medical Director/Physician Informaticist**
*Transcend Insights/Humana Inc (formerly Anvita Health)*
*San Diego, CA*

Clinical advisor and subject matter expert in the design of software for clinical use and rules authoring for engine based clinical analytics.

- Project manager, clinical lead, and chief architect of forward facing web service for the Humana clinical services to allow for real time reporting of gaps in care, medication interaction alerts, medication possession, disease progression modeling, and disease correlation.
- Responsible for HEDIS and STARS measure rules and analytics for Humana Inc.
- Clinical lead for HCC (Hierarchical Condition Categories) analytics for CMS risk adjustment.
- Deployment of the conversion to ICD10 and SNOMED terminology

**Dec 2012 to Jun 2013**
**Attending Emergency Physician**
*MetroSouth Medical Center*
*Blue Island, IL*

Attending emergency physician in active practice involved at senior management level with hospital administration and IT departments.

**Feb 2012 to Jun 2013**
**IT Consultant and Medical Liaison**
*Hinsdale Physicians Healthcare*
*Hinsdale, IL*

Advisor to Hinsdale Physicians Healthcare Executive Board of Members.

- Responsible for migration of current electronic medical/health record system with evolving business intelligence and interface products to develop a new software and network infrastructure in order to deploy new technologies within specified time and fiscal parameters
- 600+ Managed Physician Group covering more than 28,000 HMO members
- Working to integrate both medical and technical teams in project management role
- Tight team management and integration responsibilities

**Nov 2012 to Apr 2013**
**CMIO/VP Project Management**
*Empower Systems*
*Chicago, IL*

Senior product management role reporting directly to CEO/President of Empower Systems [Hospital wide integrated medical information, health record and documentation system]

- Lead technical and project management role for existing customer base in Maryland, Connecticut, New York, and New Mexico
- Member of senior product management board
- Responsible for direction of product management and technical teams
- Part of development team investigating new technology portals including tablets, convertible mobile devices, and smart phones
- Assisted sales teams with product demonstrations

**Jul 2002 to Jul 2012**
**Clinical Emergency Physician**
*Emergency Healthcare Physicians*
*Hinsdale, IL*

- Managing Partner from 2005 - 2010

**Dec 2003 to Apr 2007**
**CEO and Founder**
*Binary Genesis, LTD*
*Chicago, IL*

Develop, test, and deploy custom electronic medical documentation software and hardware solutions for emergency

departments and private physician offices.

- Developed human interface design for rapid and efficient data entry.
- Integrated point-and-click interface to optimize for coding.
- Primary liaison between physician end-user and programming development team.
- Specialized in the integration of emerging electronic records and existing office systems.

| | |
|---|---|
| Jul 2001 to Jun 2002 | **Associate Professor of Medicine** <br> *Resurrection Medical Center* <br> *Chicago, IL* |

Employed as full time emergency medicine physician and associate professor for the Resurrection Medical Center emergency medicine residency program.

## EDUCATION

| | |
|---|---|
| Aug 2009 to Sep 2012 | **DePaul University** <br> *Chicago, IL* <br> *M.S. Computer Science* |

Program on hold at current time and not completed.

| | |
|---|---|
| Jul 1998 to Jun 2001 | **University of Illinois - Chicago** <br> *Chicago, IL* <br> *Emergency Medicine Residency/Chief Resident* |

| | |
|---|---|
| Sep 1994 to Jun 1998 | **Thomas Jefferson Medical College** <br> *Philadelphia, PA* <br> *Doctor of Medicine* |

| | |
|---|---|
| Sep 1990 to Jun 1994 | **University of Wisconsin - Madison** <br> *Madison, WI* <br> *B.A. - History of Science and Philosophy* |

## MEDICAL BOARD CERTIFICATION

2003 - Present: Fellow of the American College of Emergency Physicians

Illinois medical license current and active

## VOLUNTEER AND MENTOR EXPERIENCE

June 2012 - December 2012: Active mentor and instructor via 1871 Incubator and The Chicagoland Entrepreneurial Center for medical relations, technology, computer integration and sales. [http://www.1871.com/]

2009 - 2013: Co-director, head of medical services, and team doctor for a medical relief team to Sucre, Bolivia.

## SOFTWARE/SYSTEM SKILLS

Extensive knowledge of Windows, Macintosh, and Linux operating systems, hardware, and software.

- Network (wired and wireless) design and security
- Object oriented programming skills including C++, Objective C, Java, and multiple scripting languages
- Database skills with SQL servers
- Experience with HL7 interface syntax and components
- Experience with VPN and hardware virtualization including bare metal architecture
- Familiarity with cloud based services such as infrastructure as a service (IaaS) and software as a service (SaaS)
- Custom PC hardware construction for home and business applications and appliances
- Experience with ICD9/ICD10/SNOMED terminology

Kahn Declaration Exhibit A