E-FILED
Monday, 02 March, 2020  05:02:13 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ANTHONY RODESKY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-1002-JEH |
| | ) | |
| v. | ) | |
| | ) | |
| WEXFORD HEALTH SOURCE INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO IDOC
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DOC 87

Plaintiff responds to the IDOC Defendant's motion for summary judgment, Doc 87, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1(C) as follows:

### Introduction

This case concerns IDOC's failure to provide a reasonable accommodation for Plaintiff Anthony Rodesky when he arrived at Pontiac Correctional Center ("Pontiac") in December 2013 with an "almost healed" diabetic foot ulcer on the bottom of his foot and a designated "light weight bearing" status. Although IDOC was on notice—and had medical verification—of these limitations on Mr. Rodesky's first day at Pontiac, IDOC assigned him to live in a cell up 3 flights of stairs. In order to obtain his insulin shots every day, Mr. Rodesky had to walk significant distance on his ulcerated foot, causing the ulcer to re-open, worsen, and become infected.

With this motion for summary judgment, IDOC impermissibly asks this Court to draw inferences in its favor and fails to make any mention of evidentiary burdens it carries in the reasonable accommodation analysis. This motion should be denied.

**Plaintiff's Response to IDOC Defendants' Statement of Undisputed Facts**

***Undisputed Material Facts*:**

- Paragraphs 7-9, 12, 14, 16-20

***Disputed Material Facts:***

- Paragraph 10. This witness gave inconsistent testimony on this subject and other facts in the record support an inference that this testimony is not true. *See* Plaintiff's Statement of Materials Fact ("PSMF"), *infra*, ¶¶ 31-47.

- Paragraph 11. The cited testimony indicates that the witness (who was IDOC's Rule 30(b)(6) designee) "only guess" that this was the reason. *See also* PSMF ¶¶ 31-47 (facts supporting an inference that there was no legitimate security reason to deny Mr. Rodesky a reasonable accommodation).

- Paragraph 13. Plaintiff admits the first three sentences of this paragraph. As to the fourth sentence, Plaintiff denies there was a legitimate security issue; the cited testimony references only concern about other prisoners being "jealous" if they saw a segregation inmate getting privileges that they did not think they deserved. *See also* PSMF ¶¶ 31-47 (facts supporting an inference that there was no legitimate security reason to deny Mr. Rodesky a reasonable accommodation).

- Paragraph 15. The cited portion of Plaintiff's deposition does not say that he received assistance every day. *See also* PSMF ¶ 20 (explaining the assistance that Mr. Rodesky received from escort officers).

***Disputed Immaterial Facts:***

- Paragraph 2: Documents in the record show that Dr. Shicker was personally consulted about Plaintiff's care. *See* Exhibit 13 (emails from Dr. Shicker to Dr. Tilden regarding

Anthony Rodesky). This fact is immaterial because plaintiff is not pursuing individual capacity claims against Defendant Shicker.

**Undisputed Immaterial Facts:**

- Paragraphs 1, 3-6. These facts are immaterial because Plaintiff is not pursing individual capacity claims against Defendants Shicker or Godinez.

**Plaintiff's Statement of Material Facts ("PSMF"):**

1.    On December 23, 2012, when Mr. Rodesky was transferred by bus from Tamms to Pontiac, he left Tamms in a wheelchair and was physically carried onto the bus. Wexford Exhibit A (Rodesky dep) at 57-58. When the bus arrived at Pontiac, Mr. Rodesky had to walk off the bus. *Id.* at 58.

2.    Prior to leaving Tamms, Mr. Rodesky spent 11 months in the Tamms infirmary as a result of a diabetic foot ulcer. Plaintiff's Exhibit 3 (Rodesky declaration) at ¶ 15.

3.    For the entire 11-month period, Mr. Rodesky did not leave his cell for any reason (no showers, no yard) except to medical appointments with outside medical providers, and when he left his cell on those occasions, he was taken out on a wheelchair. Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 16.

4.    For most of the 11-month period, Mr. Rodesky was completely non-weight bearing on his right foot, meaning he did not walk at all. *Id.* The only movement he made was from his bed to the toilet located in his cell, which he accomplished by hopping on his left foot. *Id.*

5.    A few weeks before leaving Tamms, Mr. Rodesky was allowed to begin walking around in his cell, putting only light weight on his right foot. *Id.* ¶ 17. This was extremely difficult for Mr. Rodesky because he did not have any assistive devices (crutches, walker, etc.) to help him. *Id.* In addition, his muscles had atrophied and IDOC did not provide him access to any physical therapy to help him re-learn to walk, which would have been consistent with the medical standard

3

of care. *Id.*; *see also* Wexford Exhibit G (Dr. Sheaff dep) at 64, 66-67, 98-99 (When patients spend a significant amount of time being non-weight bearing, they experience muscular atrophy and loss of strength, such that they need physical therapy to learn to re-learn to do basic things like getting out of bed and walking again).

6.      By late December 2012, Mr. Rodesky managed to walk approximately six steps across his cell, putting only light weight on the toe of his right foot, but he never walked any distance outside of his cell. Plaintiff's Exhibit 3 (Rodesky declaration) at ¶ 17.

7.      An IDOC document called an "Offender Health Status Transfer Summary" accompanied Mr. Rodesky from Tamms to Pontiac on December 23, 2013. Plaintiff's Exhibit 4 (Bates 1984); *see also* Wexford Exhibit C (Dr. Tilden dep) at 50-53 (testifying about this document); Plaintiff's Exhibit 12 (Arroyo dep) at 11-13, 16 (same). The top portion of the document was filled out by medical staff at Tamms to reflect Mr. Rodesky's condition at the time of transfer, and the bottom part was to be filled out by receiving medical staff at Pontiac. Plaintiff's Exhibit 12 (Arroyo dep) at 11-19.  Nurse Arroyo also reviewed Plaintiff's medical chart as part of the intake screening process. Wexford Exhibit C (Dr. Tilden dep) at 58-59.

8.      At the top of the form, there is a line for "Current/Acute Conditions/Problems" and on that line medical staff wrote: "Right foot drsg daily; wound almost healed." Plaintiff's Exhibit 4 (Bates 1984) (excerpt below, highlight added).

9.      In fact, Mr. Rodesky's foot at the time was not fully healed. Wexford Exhibit E (Dr. Powers 10/10/18 dep) at 111-112.

10.    There is also a line on the Offender Health Status Transfer Summary form for "Physical Disabilities/Limitations," and on that line medical staff wrote: "Light wt bearing on rt foot." *Id.* (excerpt below, highlight added)

11.    A "light weight bearing" patient is typically instructed that they cannot put their full weight on the wound, so they have a cane or a walker or something to take the weight off the foot when they walk. Wexford Exhibit G (Dr. Sheaff dep) at 63-64.

12.    If the patient does not adhere to weight bearing restrictions, a diabetic foot wound may open back up, setting the patient behind in treatment. Wexford Exhibit G (Dr. Sheaff dep) at 65; *see also id.* at 43, 57-61 (The skin is normally weak just after an ulcer has healed. Even after a diabetic foot ulcer is healed, the area may be fragile and the patient should not necessarily go back to full weight bearing.).

13.    The Offender Health Status Transfer Summary also indicates that Mr. Rodesky needed weekly follow up care for his right foot and that he needed a specialty referral to "wound care clinic." Plaintiff's Exhibit 4 (Bates 1984).

14.    During intake on December 23, 2012, Mr. Rodesky met with Nurse Arroyo for a medical screening and he told her about his diabetic foot ulcer and surgeries. Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 19. He told her he was light weight bearing and that he had not walked any distance for nearly a full year. *Id.* In response, she said that Mr. Rodesky needed to talk to a doctor about getting a permit or accommodation, and she said that he would be scheduled to see a doctor soon. *Id.*

15.    Mr. Rodesky should have been seen by Pontiac's Medical Director, Dr. Andrew Tilden within 72 hours of his arrival at Pontiac, but he did not see Dr. Tilden until more than two

weeks later, on January 11, 2013. Plaintiff's Exhibit 12 (Arroyo dep) at 19; Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 30.

16.     From the Pontiac intake area, Mr. Rodesky had to walk to North Cell House (NCH). Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 20. The walk was approximately 200 yards and it was extremely painful for him to walk that distance. *Id.* It was the first time in approximately 9 months that he had walked any distance. *Id.*

17.     When Mr. Rodesky reached NCH, he had to walk up three flights of stairs to get to his cell, which was located on 6 Gallery. *Id.* ¶ 21. From there, he had to walk an additional 50-75 yards to his cell. *Id.* He told the officers who were escorting him that he should not be housed up three flights of stairs because he was not able to walk and he was not supposed to walk on his foot ulcer, but they could not decide his cell assignment. *Id.* When Mr. Rodesky got to his cell and took off his sneaker, he saw that his foot had been bleeding. *Id.* All of the walking and climbing caused the site of the surgical incision on his right heel to split open. *Id.*

18.     In order to get his insulin shots at NCH, Mr. Rodesky had to walk from his cell approximately 50-75 yards to the stairs at the end of the gallery. *Id.* ¶ 22. He then had to walk down several flights of stairs and then walk to a nurse's station.  *Id.* After getting the shots, he would have to walk the same route in reverse back to his cell. *Id.* He had to do this two times a day for several months at Pontiac during 2013. *Id.*

19.     When Mr. Rodesky would make the trips to get his insulin shots, he would be in handcuffs and shackles and he would be escorted by two officers who would typically have their hands on his arms. *Id.* ¶ 23. The escort officers were there for security reasons, and not to assist Mr. Rodesky with walking. *Id.* All prisoners in NCH at the time would have escort officers at their side when they were out of their cells. *Id.*

20.     Having escort officers prevented Mr. Rodesky from falling, but the officers did not take weight off Mr. Rodesky's feet. *Id.* On occasion, an escort officer would notice him struggle to walk and offer some support, but that was not the norm. *Id.* For the most part, escort officers did not help Mr. Rodesky or take any weight. *Id.* In fact, some officers complained and gave Mr. Rodesky a hard time about walking too slowly. *Id.*

21.     When Mr. Rodesky's diabetic foot wound re-opened in December 2012-January 2013, he needed to keep weight off his foot. Wexford Exhibit G (Dr. Sheaff dep) at 31-32 (If a person who has diabetes gets a blister or ulcer on their foot, they need to avoid doing anything that puts pressure on that area); *id.* at 32 (putting pressure on the area inhibits healing and can make the wound worse); *id.* at 36 (conversely, keeping pressure off the area (i.e., "offloading") will increase the chances that the wound will heal). *See also* Wexford Exhibit B (Dr. Powers 5/11/18 dep) at 99 (a person with a diabetic foot ulcer on the bottom of his foot should "just lay flat and elevate the feet").

22.     Walking to get his insulin shots every day caused Mr. Rodesky's foot wound to re-open at the surgical site. Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 24. As Mr. Rodesky continued to walk on his foot, the wound became progressively worse. *Id.*

23.     A person who has diabetes and gets a foot ulcer (i.e., an opening of the skin) faces a significant risk of needing an amputation. Wexford Exhibit G (Dr. Sheaff dep) at 29, 34-35.

24.     Mr. Rodesky needed to take insulin shots twice a day every day. Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 25. Going without insulin injections for an extended period would have seriously jeopardized his health and could have caused his death. *Id.* The only reason he continued to make the trips for his insulin shots was because the alternative was to risk death. *Id.*

25.     Mr. Rodesky was very worried about what would happen to his foot if he kept having to walk for my insulin shots every day, and he made several efforts to resolve the problem. *Id.* ¶ 26.

26.     On December 27, 2012, Mr. Rodesky saw Warden Pfister walking down 6 Gallery. *Id.* ¶ 27. He showed Warden Pfister his foot ulcer and explained the problems he had with walking on it. *Id.* Although Warden Pfister heard what Mr. Rodesky was saying, he did not offer any substantive response. *Id.*

27.     Mr. Rodesky also discussed the issue frequently with med techs who made rounds in NCH. *Id.* ¶ 28. They told him that they would raise the issue with prison administrators but the issue did not get resolved. *Id.*

28.     On or around January 7, 2013, Mr. Rodesky filed a grievance about the fact that he was designated light weight bearing by Dr. Powers and that it was causing him excruciating pain and putting his foot at risk to walk to get his insulin shots. *Id.* ¶ 29.

29.     Mr. Rodesky also made several efforts to consult with medical staff about his problem walking. *Id.* ¶ 30. When Mr. Rodesky saw Dr. Tilden on January 11, 2013, he explained the history with his diabetic foot ulcer and told him that his foot was getting worse because he had to walk to get his insulin shots. *Id.* Dr. Tilden indicated he would take care of it, which Mr. Rodesky took to mean that he would issue a low gallery permit or make some other arrangement for him to take his insulin shots. *Id.*

30.     Mr. Rodesky was eventually moved to 2 Gallery (on the ground floor), but not until sometime around June 4, 2013. *Id.*

31.     Randy Pfister was the Warden at Pontiac from 2011 to 2015. Plaintiff's Exhibit 9 (Pfister dep) at 6. As Warden, Pfister was responsible for overseeing all of Pontiac Correctional

8

Center. *Id.* at 7. Pfister had a long career in IDOC, starting as a corrections officer in 1980 and working his way up to Deputy Director position, where he oversaw eight different IDOC facilities, by the time he gave his deposition in this case in 2018. *Id.* at 4-6. Pfister has been warden of at least two IDOC maximum security prisons. *Id.* at 6-7.

32.    Pfister was present at Pontiac when Mr. Rodesky and the other prisoners from Tamms came to Pontiac in December 2012. Plaintiff's Exhibit 9 (Pfister dep) at 25-26. He knew a lot of the prisoners in the group from his prior professional experience; he was there at intake to answer questions, reassure the prisoners that there weren't going to be any issues at Pontiac, and to "kick[] it" with them about "old days." *Id.* 26-27.

33.    In December 2012 and January 2013, Pfister would frequently visit the housing galleries at Pontiac, especially Mr. Rodesky's living unit, which housed the former Tamms prisoners and which he considered to be "high profile." Plaintiff's Exhibit 9 (Pfister dep) at 29-31. Pfister gave Mr. Rodesky's unit "a lot of attention" because he wanted to "show people how smooth [the transition from Tamms to Pontiac] could go." *Id.* at 31.

34.    According to Pfister, security staff at Pontiac should accommodate a prisoner who has a medical need to be housed on a low gallery. *See* Plaintiff's Exhibit 9 (Pfister Dep) at 63 ("Q: [C]an you think of any reason why intel would override or do something to get in the way of Mr. Rodesky being moved down to 2 Gallery if that had been medically ordered?  MR. POWELL: Objection, foundation, form, calls for speculation. THE WITNESS: Yeah, I can't even begin to guess on that, if in fact it is a reality. Q: Okay. Is it your understanding that if the medical staff issued a low gallery permit that there is no reason why security staff should override that?  MR. POWELL: Same objections. THE WITNESS: Yes, I would agree with that."); *id.* at 64 ("Q: [A]re you aware of any circumstance ever when you were at Pontiac where -- that you are aware of,

9

where intelligence or security staff wouldn't honor a low gallery permit? A. I'm not aware of that. Q: Okay. Because if there was some medical reason that a person needed to be on a low gallery that's something, the security staff would make every effort to accommodate, correct? A. Most certainly."); *id.* at 65-66 ("Q: [C]an you think of any disciplinary reason why that would warrant not honoring the low gallery permit?  MR. POWELL: Objection, form, calls for speculation. THE WITNESS: I cannot think of anything."); *see also* Plaintiff's Exhibit 12 (Arroyo dep) at 68-70 (IDOC's Rule 30(b)(6) designee testifying that Pontiac security staff honors medical orders and requests from physicians and that she has never had an issue having a low gallery permit honored by security staff).

35.    All of the prisoners who came from Tamms to Pontiac were placed in Pontiac's North Cell House "NCH." Plaintiff's Exhibit 10 (Starkey dep) at 26-28. All of the Tamms prisoners who came to Pontiac from Tamms were on either Administrative Detention (AD) or segregation status. IDOC devoted the even numbered galleries in NCH to the inmates from Tamms. *Id.*

36.    Pontiac's NCH has four floors. Plaintiff's Exhibit 9 (Pfister dep) at 11-13, 95-96. Each floor in NCH has two galleries of cells, one on the "even" side and the other on the "odd" side. *Id.* 1 and 2 Galleries are on the first floor, 3 and 4 Galleries are on the second floor, 5 and 6 Galleries are on the third floor, and 7 and 8 Galleries are on the fourth floor. *Id.*

37.    IDOC does not know why that group of prisoners was housed at Pontiac as opposed to any other facility. Plaintiff's Exhibit 10 (Starkey dep) at 4-5, 25, 28, 36. At the time, IDOC also housed AD status prisoners at other IDOC facilities, including Stateville and Menard. *Id.* at 27.

38.    AD is a form of non-disciplinary segregation in IDOC. Plaintiff's Exhibit 10 (Starkey dep) at 13. At the time, all prisoners on AD status were on one of three classification

levels: Level 1, Level 2, and Level 3. *Id.* at 14. AD prisoners would start out on Level 1, and if they "stayed out of trouble" they would work their way up to Level 3. *Id.* at 14. As they worked their way up the levels, they would be allowed more privileges. *Id.* at 14, 56-57.

39.    During the relevant time frame, Anthony Rodesky's status assignment was as follows:

> 12/23/12 to 1/15/13 - disciplinary segregation
> 1/15/13 to 4/14/13 - AD Level 1
> 4/15/13 to 11/17/13 - AD Level 2
> 11/18/13 to 12/4/15 - AD Level 3

Plaintiff's Exhibit 10 (Starkey dep) at 12-13.

40.    During the relevant time frame, Anthony Rodesky's cell assignments were as follows:

> 12/23/12 to 1/15/13 - 6 Gallery, Cell 12
> 1/15/13 to 3/31/13 - 5 Gallery, Cell 33
> 3/31/13 to 4/7/13 - 8 Gallery, Cell 19
> 4/7/13 to 6/4/13 - 8 Gallery, Cell 37
> 6/4/13 to 7/9/13 - 2 Gallery, Cell 33

Plaintiff's Exhibit 9 (Pfister dep) at 32-38; IDOC Exhibit F (Robison Declaration).

41.    IDOC's Rule 30(b)(6) designee testified that IDOC housed the segregation and AD Level 1 prisoners from Tamms on 6 and 8 Galleries at Pontiac NCH. Plaintiff's Exhibit 10 (Starkey dep) at 4-5, 63. He further testified that AD Level 2 and AD Level 3 prisoners were housed on 2 and 4 Galleries at Pontiac NCH. *Id.*

42.    IDOC's Rule 30(b)(6) designee could not give a reason why the different AD Levels were housed on different galleries at NCH, but provided a guess: "[T]he reason being, *I can only guess,* that 2 and 4 Gallery are open bar typical cells, with the exception of a few solid steel doors on 2 Gallery. All of the 6 and 8 were either solid steel doors or perforated doors. And it just made sense I believe to house the most aggressive offenders who might be in segregation or

11

might be in Level 1 or even Level 2 on 6 and 8 Gallery." Plaintiff's Exhibit 10 (Starkey dep) at 4-5, 25-26 (emphasis added).

43.    According to Randy Pfister, there was no specific rationale as to which of the Tamms prisoners went where in Pontiac's NCH, except that security staff would ensure that prisoners who had specific safety issues with other prisoners were kept apart. Plaintiff's Exhibit 9 (Pfister dep) at 34.

44.    IDOC cannot give a reason for any of the changes to Mr. Rodesky's cell assignments in NCH during 2013. Plaintiff's Exhibit 10 (Starkey dep) at 4-5, 40-47.

45.    There were solid steel doors on cells in 1 Gallery in NCH that housed some of the Tamms prisoners. Plaintiff's Exhibit 10 (Starkey dep) at 26.

46.    There were also solid steel doors on some cells in 2 Gallery in NCH. Plaintiff's Exhibit 10 (Starkey dep) at 25-26; Plaintiff's Exhibit 3 (Rodesky Declaration) at ¶ 32.

47.    In 2013, there were other prisoners in NCH who were moved from high galleries (6 Gallery or 8 Gallery) to 2 Gallery. Plaintiff's Exhibit 3 (Rodesky Declaration) at ¶ 33. Some of those prisoners of these prisoners who were moved to lower galleries were in segregation and/or Level 1 or Level 2 administrative detention. *Id.*

48.    Mr. Rodesky's diabetic foot ulcer condition worsened to the point that he needed and received a below-knee amputation in July 2015. *Id.*

## Argument

### I.    Legal Standard

Summary judgment is warranted if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden to establish that no material facts are in genuine dispute. *Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 160 (1970). Any doubt as to the existence of a genuine issue is resolved against the moving party. *Id.*

## II.    Godinez and Shicker Are No Longer Defendants and Are Not Entitled to Summary Judgment

As Defendants observe, Plaintiff named Godinez and Shicker as defendants in the lawsuit in their official capacities only. When Plaintiff filed his complaint, Godinez and Shicker were IDOC's Director and Medical Director respectively. Pursuant to Federal Rule of Civil Procedure 25, these individuals are no longer defendants because they no longer occupy these roles within IDOC.  Rather, under Rule 25(d), these official capacity defendants were automatically substituted and now they are Rob Jeffreys (the current IDOC Acting Director) and Steven Meeks (the current IDOC Medical Director). Plaintiff does not seek to establish personal liability for damages on Count I against Godinez and Shicker, so Defendants' arguments about Godinez's and Shicker's lack of personal involvement in Mr. Rodesky's care, *see* Doc. 87 at 6-9, are all beside the point.

Notwithstanding their lack of personal involvement, Jeffreys and Meeks are still proper defendants on Count I because Plaintiff's complaint contains a prayer for injunctive relief. Plaintiff has had ongoing problems with his medical treatment throughout the pendency of this case and Plaintiff may seek injunctive relief at trial. Plaintiff need not establish personal involvement by official capacity defendants to obtain injunctive relief. *See Johnson v. Randle*, 2012 U.S. Dist. LEXIS 75080 at *25-26 (S.D. Ill. May 31, 2012).

## III.    IDOC Is Not Entitled to Summary Judgment on Plaintiff's ADA/Rehabilitation Act Claims

Under the Americans with Disabilities Act (ADA), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination

by any such entity." 42 U.S.C. § 12132. Similarly, under the Rehabilitation Act, no "qualified individual with a disability. . . shall, solely by reason of[ ] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

The crux of Plaintiff's ADA/Rehabilitation Act Claim is that IDOC failed to provide a reasonable accommodation to Plaintiff during his first several months at Pontiac Correctional, when Mr. Rodesky had an "almost healed" diabetic foot ulcer on the bottom of his right foot, was "light weight bearing," and was substantially limited in his ability to walk. PSMF ¶¶ 8-10. Notwithstanding that limitation, IDOC forced him to walk a significant distance to his cell, which was up three flights of stairs. *Id.* ¶¶ 17-18. At the time, Mr. Rodesky needed to take insulin injections twice a day. *Id.* ¶ 24. In order to get his insulin, he had to traverse several flights of stairs and walk significant distances, causing him extreme pain and grave harm to his foot. *Id.* ¶¶ 12, 18, 21-24. Mr. Rodesky did everything in his power to seek some kind of accommodation—he explained his disability to a nurse at intake, asked cell house staff for help, wrote grievances, talked to the warden, and put in requests to see a medical provider—but IDOC provided no accommodation for over 5 months. *Id.* ¶¶ 14, 25-29.[1]

In this case, IDOC does not dispute that Mr. Rodesky was a qualified individual with a disability under these statutes. Rather, IDOC claims it is entitled to a finding as a matter of law that (1) Mr. Rodesky was not excluded from any program or discriminated against by reason of

---

[1] IDOC contends that this this failure to accommodate is the only basis for plaintiff's ADA/ Rehabilitation Act claims, *see* Doc. 87 at 15, but this is not correct. As IDOC's counsel knows from asking Mr. Rodesky in his deposition about the basis of his ADA claims, there are many other bases for this claim. Wexford Defendant's Exhibit A (Rodesky dep) at 106-117.

14

his disability and (2) IDOC did not act with deliberate indifference. As explained in further detail below, IDOC[2] is not entitled to these findings and Plaintiff's claims should proceed to trial.

### A. A Reasonable Jury Could Find That Mr. Rodesky Was Excluded From a Program or Discriminated Against by Reason of His Disability

IDOC asserts that it is entitled to summary judgment because Mr. Rodesky managed to receive his insulin shots, and because IDOC's "escort officers" constituted a reasonable accommodation. In advancing these arguments, Defendants ask the Court to construe the facts in the record in their favor, which the Court cannot do at this juncture.

### 1. IDOC Is Not Entitled to a Factual Finding That Mr. Rodesky Was Merely Inconvenienced

In support of their position, Defendants ask this Court to find that Mr. Rodesky was merely "inconvenienced" by having to traverse stairs and walk a significant distance in order to receive his insulin shots twice daily. *See* Doc. 87 at 11. The facts in the record, however, paint a much graver picture: Mr. Rodesky's diabetic foot ulcer was almost healed when he arrived at Pontiac on December 23, 2013. PSMF ¶¶ 8-9. Having to walk at Pontiac not only caused him severe pain, but it also caused the diabetic foot wound on the bottom of his right foot to re-open and become progressively worse. *Id.* ¶¶ 12, 16-22. As Mr. Rodesky's wound re-opened, he needed to "offload" and stay off his foot. *Id.* ¶¶ 21, 23. Rather than accommodating that limitation, IDOC give him no alternative but to walk on his injured foot, making the ulcer worse, and increasing his risk of needing a foot amputation, which is in fact exactly what happened to him. *Id.* ¶¶ 22-23, 48. This

---

[2] Plaintiff's Complaint names the IDOC Director in his official capacity as the defendant on these claims, which the same as naming the agency itself, see *Richman v. Sheahan*, 270 F.3d 430, 439 (7th Cir. 2001). For ease of reference, Plaintiff refers to the defendant on these counts as IDOC in this document.

is not a case of mere inconvenience, and in this way Defendants' comparison to *Wagoner v. Lemon*,
778 F.3d 586 (7th Cir. 2015) is misplaced.

The plaintiff in *Wagoner* faced the inconvenience of having to wait and humiliation from
having to crawl, but there is no indication he suffered further debilitating injury as a result.
*Wagoner* can be further distinguished because *Wagoner* was about a plaintiff's failure to properly
assert his theory of exclusion. But this case concerns discrimination by failure to provide a
reasonable accommodation, which, as described in further detail below in Part III.A.3, *infra*, is a
basis for establishing liability under the ADA and Rehabilitation Act. *See e.g.*, *Lacy v. Dart*, No.
14 C 6259, 2015 U.S. Dist. LEXIS 138725, at *34-36 (N.D. Ill. Oct. 8, 2015) (distinguishing
*Wagoner* from cases involving failure to provide reasonable accommodations); *Bramlett v. Dart*,
No. 14 C 5939, 2015 U.S. Dist. LEXIS 89007, at *6-9 (N.D. Ill. July 9, 2015) (same).

IDOC overstates the significance of the fact that Plaintiff managed to get his insulin shots,
notwithstanding these barriers he faced.  It is true that he obtained his shots, but that was only
because the alternative for him was to seriously jeopardize his health or risk death. PSMF ¶¶ 24.
An individual's ability to overcome a lack of accommodation in order to avoid serious injury or
death does not moot a failure to accommodate claim, especially if in overcoming that barrier, the
individual suffers extreme pain. *See Nawrot v. CPC Int'l*, 259 F. Supp. 2d 716, 726 (N.D. Ill. 2003)
("To hold that a person with potentially life threatening diabetes is not entitled to accommodations
so that he may monitor his blood sugar levels would force diabetics like Nawrot to choose between
working while risking physical harm and death, or unemployment. The ADA was created to
prohibit placing disabled persons in this position."); *Schmidt v. Odell*, 64 F. Supp. 2d 1014, 1032
(D. Kan. 1999) ("The fact that plaintiff was actually able to use most of the jail services does not
preclude his claim in light of the fact he was able to do so only by virtue of exceptional and painful

16

exertion which was contrary to a physician's instructions concerning his disability."); *Miller v. Wisconsin Dep't of Corr.*, No. 08-CV-62-BBC, 2008 WL 2563154, at *5 (W.D. Wis. Apr. 22, 2008) ("From petitioner's allegations it is possible to infer that respondent . . . 'denied' petitioner some of the basic services of the prison by denying him a cane when petitioner had to walk long distances in severe pain to seek out prescribed medications."); *see also Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 278 (1st Cir. 2006) (denying prison's motion for summary judgment where an individual with a disability was denied a low bunk, despite that he was able to hoist himself onto the top bunk).

### 2. IDOC is Not Entitled to a Factual Finding that Disciplinary or Security Concerns Prevented Mr. Rodesky From Being Moved to a Lower Gallery

IDOC also asks this Court to find that security concerns prevented IDOC from housing Plaintiff on a low gallery, *see* Doc 87 at 11-12, but the record does not support such a finding.

First and foremost, IDOC is unable to say why any particular housing assignment was made for Mr. Rodesky. IDOC produced a Rule 30(b)(6) deponent to testify on behalf of the Department about why Mr. Rodesky's housing assignments were made, and that witness, Joel Starkey, testified unequivocally that he could not provide that information. PSMF ¶¶ 37, 42-44.

The only information that Mr. Starkey could provide was about how assignments were *generally* made among the group of prisoners who arrived at Pontiac with Mr. Rodesky. PSMF ¶ 35. According to Starkey, all prisoners in this group were assigned to either segregation status or "administrative detention" (AD) status at the time. *Id.* ¶ 35. Starkey explained that AD was a form of non-disciplinary segregation that had three Levels: Level 1, Level 2, and Level 3. *Id.* ¶ 38. Starkey further explained that prisoners could work their way "up" the levels by staying out of trouble. *Id.* ¶ 38. Going up levels came with additional privileges. *Id.* ¶ 38.

17

Starkey further testified that individual prisoners' gallery assignments within NCH were determined by their AD Level and/or segregation status. According to Starkey, prisoners who were in segregation, AD Level 1, and AD Level 2 were housed in 6 and 8 Galleries (on the third and fourth floors of NCH), while prisoners in AD Level 3 were housed on 2 and 4 Galleries. DSUF ¶ 10. Starkey "guess[ed]" that the reason this for this system is that cells on 6 and 8 Galleries had perforated or solid steel doors, while cells on 2 and 4 Galleries had open bars. PSMF ¶ 42.[3]

While the system Starkey described might have been the general system for making housing assignments in NCH at the relevant time period, Plaintiff disputes that this system actually dictated *his* housing assignment. Most notably, if one compares Mr. Rodesky's segregation/AD status, *see id.* ¶ 39, against his housing assignment, *see id.* ¶ 40, it is not at all consistent with the system Starkey described. By Starkey's account, Mr. Rodesky should have been housed on 6 or 8 Gallery exclusively until November 17, 2013 (when he moved from Level 2 to Level 3), but in fact he was housed on 5 Gallery for a period and was moved to 2 Gallery on June 4, 2013. Furthermore, Pontiac's Warden Randy Pfister gave testimony contrary to Starkey's. According to Pfister, there was no specific rationale behind cell assignments in NCH, except that security staff would ensure that prisoners who had specific safety issues with other prisoners were kept apart. *Id.* ¶ 43.[4]  This testimony from Pfister alone is sufficient for the Court to reject all of Starkey's

---

[3] Notably, Mr. Starkey gave inconsistent testimony on this subject. At one point he testified that only AD Level 3 was allowed on 2 or 4 Galleries, but at another point he testified that Level 2 and Level 3 were allowed on 2 and 4 Galleries. PSMF ¶ 41. If his later testimony is credited, then Mr. Rodesky would have been allowed on 2 Gallery much earlier than he was actually placed there, when he moved from Level 1 to Level 2 on April 14, 2013. Either way, the system Starkey described does not account for Mr. Rodesky's actual placement.

[4] To be sure, Pfister has close involvement with the group of prisoners who came from Tamms along with Mr. Rodesky and facts in the record support a jury inference that Pfister would have personal knowledge of the system that IDOC's designee described, if it truly existed in a rigid fashion. PSMF ¶¶ 31-33.

testimony about the system for assigning AD status prisoners to various galleries in Pontiac's NCH. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

Even if the system Starkey described dictated gallery assignments in NCH during the relevant time period, facts in the record show that it was a flexible system that could be overridden to accommodate a disability or medical need. PSMF ¶ 34; *see also* DSMF ¶ 17-18; Doc. 87 at 13 (claiming that Mr. Rodesky was moved to 2 Gallery on June 4, 2013 pursuant to a medical permit dated May 9, 2013). Furthermore, both Warden Pfister and Teresa Arroyo (another IDOC Rule 30(b)(6) designee) testified unequivocally that IDOC could and would accommodate prisoners who had medical permits or medical needs to be housed on a low gallery. PSMF ¶ 34.

To be sure, IDOC's reliance on Defendants relied on *Love v. Westville Correctional Center*, 103 F.3d 558, 561 (7th Cir. 1996) is misplaced. IDOC cites *Love* for the proposition that "a prison can rely on 'disciplinary reasons' as the motivation for its actions," Doc. 87 at 11, but *Love* does not establish any bright line rule to that effect. *Love* merely observes that *if* the jail defendant in that case had presented evidence of security or safety concerns (which it had not), that evidence could be "taken into account." *Love*, 103 F.3d at 561. This is an uncontroversial observation in light of the fact-specific nature of the inquiry around reasonable accommodations. *See infra* Part III.A.3. *Love* does not stand for the proposition that a Court must blindly accept whatever security-related arguments a defendant prison advances in a failure to accommodate case, which is what IDOC asks this Court to do in this case. There is a genuine issue of material fact about the role that security concerns played in IDOC's failure to accommodate Mr. Rodesky.

### 3. Viewing the Facts in the Record in the Light Most Favorable to Plaintiff, Defendants Did Not Provide Plaintiff a Reasonable Accommodation

The Seventh Circuit has held that "a failure to make 'reasonable modifications [and accommodations] in policies, practices, or procedures' can constitute discrimination under Title II." *Lacy v. Cook County*, 897 F.3d 847, 853 (7th Cir. 2018); *see also* 28 C.F.R. § 35.130(7)(i) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."); *Jaros v. Illinois Department of Corrections*, 684 F.3d 667, 672 (7th Cir. 2012) (the Supreme Court has recognized a duty to accommodate as part the Rehabilitation Act).

In the prison context, a reasonable accommodation should afford a prisoner with a disability access to programs and services on the same basis as other inmates. *Jaros*, 684 F.3d at 672. Refusing to make such reasonable accommodations is "tantamount to denying access." *Id.*

A determination of whether an accommodation is reasonable is a fact-specific inquiry that requires balancing the needs of the parties. *E.g. Lacy*, 897 F.3d at 865; *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002); *Dadian v. Vill. Of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001). Courts determine reasonableness by balancing the cost to the defendant and the benefit to the plaintiff. *Dadian*, 269 F.3d at 838. Once a plaintiff has shown that the accommodation he seeks is reasonable on its face, the burden is on the defendant to demonstrate unreasonableness or undue hardship in the particular circumstances. *Oconomowoc*, 300 F.3d at 784-85. To meet this burden, the defendant must show that it imposes undue financial or administrative burdens, or requires a fundamental alteration to the program. *Id.*

IDOC overlooks these important standards, making no mention of them in its motion. Instead, IDOC asks the Court to find that the "escort officers" who took plaintiff for his insulin shots constituted a reasonable accommodation, such that it is entitled to judgment as a matter of law. This argument fails in several respects.

### a. Prison Escort Officers Were Not an Accommodation, and Even If They Were, They Were Not Effective

First, IDOC presents no evidence that it ever made an actual assessment of the specific costs of potential accommodations, let alone that these costs would overcome the benefits of accommodation. *See Phipps v. Sheriff of Cook Cty.*, 681 F. Supp. 2d 899, 922 (N.D. Ill. 2009) (denying summary judgment where "the plaintiffs dispute the claim that the Sheriff ever made an actual assessment of the safety concerns raised by the requested accommodations"). To the contrary, every effort Mr. Rodesky made to obtain any kind of accommodation was basically ignored. PSMF ¶¶ 14-15, 26-29. Furthermore, the escort officers were not provided to Mr. Rodesky as an accommodation—they escorted Mr. Rodesky anytime he was outside of his cell as they did for all prisoners in NCH at the time. *Id.* ¶ 19. The escort officers also did not "take weight" off of Mr. Rodesky as he walked, which they presumably would have done if their purpose was to accommodate his "light weight bearing" medical status. *Id.* ¶¶ 10-11, 20.

Even if the presence of escort officers could be considered an accommodation, it was not a reasonable accommodation, as it was totally ineffective. *Oconomowoc*, 300 F.3d at 784 (an accommodation must be efficacious to be reasonable). The fact that IDOC provided an accommodation, does not mean that it satisfied its obligations under the ADA and/or Rehabilitation Act. *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) ("An ineffective 'modification' or 'adjustment' will not accommodate a disabled individual's limitations."); *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005) ("[T]he employer is obliged to provide

an accommodation that effectively accommodates the disabled employee's limitations."); *Erjavac v. Holy Family Health Plus*, 13 F. Supp. 2d 737, 750 (N.D. Ill. 1998) ("[A]n employer need not provide every accommodation an employee requests, merely providing an accommodation does not conclusively deem the accommodation reasonable."). Despite the escort officers' presence, Mr. Rodesky still experienced terrible pain and further injury to his diabetic foot ulcer from walking to obtain his insulin shots. PSMF ¶ 20-22. Many courts have declined to find similarly ineffective accommodations unreasonable. *See EEOC v. Sears*, 417 F.3d at 802 (denying summary judgment to employer that provided accommodation on the basis of evidence adduced by plaintiff that supported a jury finding that the accommodation was ineffective); *Lacy v. Dart*, No. 14 C 6259, 2015 WL 5921810, at *12 (N.D. Ill. Oct. 8, 2015) (finding that commode chairs were not a reasonable accommodation where plaintiffs "consistently and credibly testified to being unable to use the toilet facilities or being able to do so only with great difficulty"); *Norfleet v. Gaetz*, No. 15-CV-160-MJR-SCW, 2017 WL 3970964, at *9 (S.D. Ill. Sept. 8, 2017) (denying summary judgment where prisoner plaintiff was provided a wheelchair and gloves but the gloves were slippery and plaintiff got blisters without gloves); *Erjavac*, 13 F. Supp. 2d at 751 (denying summary judgment to an employer that modified its phone coverage policy to accommodate an employee with a disability who required increased bathroom access because the modification did not provide sufficient bathroom access).

### b. Plaintiff Has Met His Initial Burden of Proving That His Requested Accommodation Is Reasonable On Its Face

The accommodation that Plaintiff sought—being housed on a low gallery—is reasonable on its face. IDOC prisoners are routinely housed on low galleries for medical reasons and it was the accommodation that was granted to Mr. Rodesky, only six months too late. PSMF ¶¶ 30, 34, 40. Whereas this accommodation cost IDOC nothing, the cost of denying it to Mr. Rodesky cannot

be overstated. Mr. Rodesky was forced to endure months of pain and his diabetic foot ulcer re-opened and became progressively worse, ultimately requiring his entire leg to be amputated below his knee. *Id.* ¶¶ 10-12, 21-23, 48.

### c. IDOC Is Not Entitled to a Finding That Moving Plaintiff To a Low Gallery Would Have Imposed a Financial or Administrative Burden, or Required a Fundamental Alteration to a Program

IDOC carries the burden of showing that granting this accommodation poses an undue burden, either because it imposes undue financial or administrative burdens, or because it requires a fundamental alteration to the program. *Oconomowoc*, 300 F.3d at 787. IDOC has not even attempted to meet this burden—IDOC does not even acknowledge that it has this burden at all.

IDOC's failure to address this issue in its moving brief constitutes waiver, and IDOC should not be allowed to address this issue for the first time in reply. *Acuff v. IBP, Inc.*, 77 F. Supp. 2d 914, 935 (C.D. Ill. 1999) (perfunctory and undeveloped arguments are waived, citing *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)). Plaintiff has no way of knowing which of these two theories IDOC might rely on, and Plaintiff will have no opportunity to respond if these are raised in reply.

To be sure, however, as discussed above, Warden Pfister testified that there was no reason a low gallery permit could not have been accommodated. At summary judgment, this testimony must be taken as true. Furthermore, the fact that IDOC ultimately provided the accommodation casts serious doubt upon whether it would have been a "fundamental alteration" of a program for them to have done so in the first place. *See Phipps*, 681 F. Supp. 2d at 922 (factual issue remained concerning the reasonableness Sheriff's determination that making requested accommodations would have posed a security threat, especially where the challenged accommodations were provided in other parts of the jail).

23

Similarly, even if IDOC could provide a compelling explanation for not being able to house Mr. Rodesky in any low gallery cell in Pontiac's NCH, IDOC could and should have considered other accommodations, such has having the nurse who administered his insulin injections climb the stairs and provide them to him on 6 Gallery.

### d. IDOC Is Not Entitled To A Finding That Its 6-Month Delay In Accommodating Plaintiff Was Reasonable

IDOC also asks this Court to find that its six-month delay in moving Mr. Rodesky to a low gallery was reasonable. Doc. 87 at 13. IDOC is not entitled to this finding.

In support of its position, IDOC cites the fact that Mr. Rodesky was, for a time, on disciplinary segregation status, but that is of no moment. Mr. Rodesky left segregation status on January 15, 2013, but he was not moved to 2 Gallery until June 4, 2013. IDOC is not entitled to an inference that Mr. Rodesky's *three weeks* in segregation accounts for the six-month delay.

In further support of its position, IDOC relies upon *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) (finding that a 20-month delay in accommodating a disabled employee was reasonable). But *Jay* does not purport to establish blanket window of time to accommodate a qualifying individual in any situation. To the contrary, the determination of whether an accommodation is reasonable is a fact-specific inquiry that depends on the totality of the circumstances. *Dadian*, 269 F.3d at 838 (7th Cir. 2001) ("Whether a requested accommodation is reasonable is highly fact-specific, and determined on a case-by-case basis by balancing the cost to the defendant and the benefit to the plaintiff"). In *Jay*, an employee who was injured and could not climb stairs requested an accommodation of being assigned to ground-level work. *Jay*, 233 F.3d at 1016. His employer, however, did not have any open work positions on the ground level for 20 months. *Id.* at 1017. The Seventh Circuit found the employer's failure to provide a ground level position to Jay for 20 months was reasonable because employers are not required to bump others

24

to give a disabled employee a position, nor are they required to create a new position. *Id.* Additionally, the *Jay* court found good faith on the part of the employer because it considered him for reassignment weekly and he was provided medical layoff in the meantime. *Id.* Balancing the respective needs of the parties, the court found the delay at issue in that case to be reasonable. But the same cannot be said here. IDOC offered no explanation for its refusal to accommodate Mr. Rodesky for the first 6 months he was requesting accommodation. IDOC does not contend, for example, that they would have put Mr. Rodesky in a cell on 2 Gallery but that they were all occupied, let alone occupied by other prisoners with disabilities. Furthermore, balancing the respective needs of IDOC and Mr. Rodesky, the cost to him of delay was immense—he suffered immense pain and serious bodily harm. Every day, he was forced to make a decision between risking his life and health by skipping his insulin shots and risking his limbs by walking to get them. Whereas 20 months might have been reasonable under the circumstances in *Jay*, a 6-month delay is not reasonable under the circumstances present in this case.

Finally, IDOC attempts to shield itself by noting that Dr. Tilden apparently did not issue an official medical permit for Mr. Rodesky to be housed on a low gallery until May 9, 2013. Doc. 87 at 13. This effort fails. Mr. Rodesky made both medical *and security staff* aware of his need for an accommodation from the first day he arrived at Pontiac and at several points thereafter. PSMF ¶¶ 14, 25-29. IDOC admittedly had the right to require medical verification of Mr. Rodesky's disability. However, in this case, it *had* such verification from medical staff at Tamms, who indicated on Mr. Rodesky's transfer form that he was "light weight bearing." *Id.* ¶ 7. But even without this document, if IDOC doubted Mr. Rodesky's need to be housed on a low gallery, then it was IDOC's responsibility to obtain that verification in a timely manner. Mr. Rodesky, as a prisoner, had no ability to arrange his own medical appointments. He was entirely dependent on

the IDOC itself to arrange for him to see Dr. Tilden. IDOC cannot rely on its own delay as an excuse not to accommodate Mr. Rodesky's disability.

### B.  A Reasonable Jury Could Find that IDOC Acted With Deliberate Indifference

Plaintiff may be awarded damages in ADA/Rehabilitation Act claims if he can show that the defendant public entity was deliberately indifferent to his rights. *Lacy v. Cook County, Illinois*, 897 F.3d 847, 862 (7th Cir. 2018). Deliberate indifference occurs when "the defendant knew that harm to a federally protected right was substantially likely and . . . failed to act on that likelihood." *Id.* (quoting *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 344-45 (11th Cir. 2012).

There is no question that IDOC knew about Mr. Rodesky's medical needs—Pontiac officials were on notice upon Mr. Rodesky's arrival at Pontiac. His "Offender Health Status Transfer Summary," which accompanied him from Tamms to Pontiac, states: "Right foot drsg daily; wound almost healed," and "Light wt bearing on rt foot." PSMF ¶¶ 7-10, 13.

This was plenty sufficient to alert IDOC that Plaintiff needed an accommodation. If there was any doubt, Mr. Rodesky's entire medical file was available to the Department, and his records contained detailed notes about the extreme measures that he had undergone over the prior year as a result of the ulcerated sores on his feet. PSMF ¶ 7. All the IDOC had to do was look.

In addition, during Mr. Rodesky's medical intake at Pontiac, he explicitly told Nurse Arroyo about his diabetic foot ulcer and surgeries, that he was light weight bearing, and that had had not walked any distance for nearly a year. *Id.* ¶ 14. A few days later, on December 27, 2012, Mr. Rodesky showed Warden Pfister his foot and explained his problems walking on it. Warden Pfister heard this explanation. *Id.* ¶ 26. Mr. Rodesky further discussed the issue with the med techs during their rounds in NCH. *Id.* ¶ 27.

26

On or around January 7, 2013, Mr. Rodesky filed an emergency grievance, putting IDOC on further notice about his condition. *Id.* ¶ 28. The grievance stated that administration at Pontiac was overriding orders from Dr. Marvin Powers. He expressed that Pontiac's "administrative decisions have caused [him] excruciating pain." *Id.* In the grievance, he laid out his history of diabetic ulcers and surgery, and explained that he was "light weight bearing only." *Id.*

On January 11, 2013, Mr. Rodesky explained all this to Dr. Tilden. *Id.* ¶ 28. Furthermore, Mr. Rodesky was seen by "escorting" officers, who witnessed him painfully hobble up and down the gallery and stairs at least twice daily for nearly 6 months. *Id.* ¶¶ 19-20.

Despite having all of this information, there is no indication in the record that IDOC considered any accommodation to Mr. Rodesky before his low gallery permit was issued on May 9, 2013. Escort officers were not an accommodation, but a standard security procedure. *Id.* ¶ 19. When Mr. Rodesky told Nurse Arroyo about his circumstances during his medical intake, she said he needed to see a doctor, and that he would be scheduled soon, but that did not happen. *Id.* ¶ 14. When Mr. Rodesky finally saw Dr. Tilden two weeks later, Dr. Tilden indicated he would take care of the problem, but he did not issue a low gallery permit for 5 months. *Id.* ¶ 29; Doc. 87 at 13.

In light of all these facts, a jury could easily find that IDOC acted with deliberate indifference. Plaintiff did everything in his power to get someone to pay attention: he told nurses, doctors, guards, the assistant warden, and the warden himself. Each of them knew about his disability, which was clearly memorialized on an IDOC document that came with him from Tamms to Pontiac. Each of them knew that failure to accommodate his disability was causing him extreme pain and a risk of further injury. None of them did a single thing. This is the epitome of deliberate indifference.

IDOC asks this Court to view the fact that they moved him almost a month after his medical permit was issued as proof that it was "not aware of a federally protected right" when Plaintiff came to Pontiac, *see* Doc. 87 at 15. In making this argument IDOC again impermissibly asks this Court to view facts in the record in the light most favorable to them, which this Court may not do. IDOC is not entitled to a finding that did not act with deliberate indifference.

**Conclusion**

For the foregoing reasons, the IDOC's motion for summary judgment should be denied.

Respectfully Submitted,

/s/ Elizabeth Mazur
Attorney for the Plaintiff

Alan Mills
Elizabeth Mazur
Nicole Schult
Uptown People's Law Center
4413 N. Sheridan
Chicago, IL 60640
(773) 769-1411

**CERTIFICATE OF SERVICE**

I, Elizabeth Mazur, an attorney, certified that I served a copy of this pleading on all counsel of record by filing the same through the CM/ECF system.

/s/ Elizabeth Mazur