**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

ANTHONY RODESKY, )
)
    Plaintiff, )      Case No. 15-cv-1002-JEH
)
v. )
)
WEXFORD HEALTH SOURCE INC., et al., )
)
    Defendants. )

**PLAINTIFF'S RESPONSE IN OPPOSITION TO WEXFORD
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DOC. 90**

Plaintiff responds to the Wexford Defendant's motion for summary judgment, Doc. 90, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1(C) as follows:

**Introduction**

In this case, Plaintiff Anthony Rodesky alleges that Defendants Dr. Marvin Powers and Dr. Andrew Tilden were deliberately indifferent to his serious medical needs while has under their care for diabetic foot ulcers from 2011 to 2015. Plaintiff's foot ulcer first appeared in August 2011, when he lost access to properly-fitting shoes, and Dr. Powers refused to order him medically necessary diabetic shoes. Without proper shoes, Mr. Rodesky's ulcers worsened over time and became infected, requiring a series of surgical interventions. Eventually the ulcers healed, right around the time that Mr. Rodesky was transferred from Tamms Correctional Center (where he was under Dr. Powers care) to Pontiac Correctional Center (where he was under Dr. Tilden's care) in December 2012. As a result of deliberate indifference by Dr. Tilden at Pontiac, however, the ulcer reopened and worsened again soon after his transfer, and again for a third time in 2014. During his

third round of ulceration, Mr. Rodesky's condition became so dire that he became septic, and the only way to stem his infection was to have a below knee amputation, which occurred in July 2015.

In the instant motion, Defendants Powers and Tilden draw the Court's attention to the amount of care that Mr. Rodesky received during the periods when he was seriously ill and under the care of outside specialists. Focusing on the quantity of care, Defendants ignore the facts in the record that show their deliberate indifference during crucial periods in the course of his ulcer, when Mr. Rodesky was not under the closely care of outside specialists. As discussed in further detail below, a jury could find that Dr. Powers and Dr. Tilden were deliberately indifferent to Mr. Rodesky's serious medical needs during these periods, and summary judgment should be denied.

**Plaintiff's Response to IDOC Defendants' Statement of Undisputed Facts**

*Undisputed Material Facts*

- Paragraphs 1-148, 151-167, 169, 171-173, 175-177, 179-180, 182-190, 192-241

*Disputed Material Facts*

- Paragraph 168: *See* Doc. 95 (Plaintiff's Response to IDOC Defendants Motion for Summary Judgment) PSMF ¶¶ 31-47.

- Paragraph 170: According to the cited testimony, Starkey had "no idea" why Plaintiff was moved to 5 Gallery.

- Paragraph 174: The note shoes that Dr. Tilden formed a plan to check with see if Mr. Rodesky's insulin shots could be given at cell front, but the note indicates that the plan was likely never carried out. Wexford Defendant's Exhibit C (Dr. Tilden dep) at 99-101.

- Paragraph 178: Although the note indicates that Dr. Tilden was awaiting a response from New Jersey, Pontiac medical staff had not even been submitted the request to New Jersey yet. Plaintiff's Statement of Material Facts ("PSMF"), *infra*, at ¶ 61.

- Paragraph 181: Although the note indicates that Dr. Tilden was awaiting a response from New Jersey, Pontiac medical staff had not even been submitted the request to New Jersey yet. *Id.*

- Paragraph 191: The note cited is illegible and does not appear to contain information that Defendants contend.

***Disputed Immaterial Facts***

- None

***Undisputed Immaterial Facts***

- Paragraphs 149-150 (Dr. Dickinson's opinions on these matters are not relevant or admissible because they are not probative of any fact at issue (Paragraph 149) and there is no indication Dr. Dickinson had full information about Dr. Powers actions (Paragraph 150)).

***Plaintiff's Statement of Material Facts ("PSMF")***

1. A person who has diabetes and gets a foot ulcer (i.e., an opening of the skin) faces a significant risk of needing an amputation at some point. Wexford Exhibit G (Dr. Sheaff dep) at 29, 34-35.

2. With appropriate therapy, however, including surgical debridement, offloading of foot pressure, and attention to infection foot ulcers heal in many patients, and the need for amputation is averted. Plaintiff's Exhibit 11 (Diabetic Foot Ulcers and Their Recurrence, *New England Journal of Medicine* (June 15, 2017)) at 2368; Wexford Exhibit G (Dr. Sheaff dep) at 39-49 (acknowledging the *New England Journal of Medicine* as a reliable source in the medical field).

3. A person who has diabetes and neuropathy needs to visually monitor their feet closely every day for signs of blisters or redness. Wexford Exhibit G (Dr. Sheaff dep) at 29-30.

Visual monitoring is important because they might have an injury to their foot that they cannot feel because of neuropathy. *Id.* at 30.

4.       If a person who has diabetes gets a blister or ulcer on their foot, they need to avoid doing anything that puts pressure on that area. *Id.* at 31-32. Putting pressure on the area inhibits healing and can make the wound worse. *Id.* at 32. Conversely, keeping pressure off the area (i.e., "offloading") will increase the chances that the wound will heal. *Id.* at 36. *See also* Wexford Exhibit B (Dr. Powers 5/11/18 dep) at 99 (a person with a diabetic foot ulcer on the bottom of his foot should "just lay flat and elevate the feet").

5.       Preventing infection also increases the chance that a diabetic foot wound will heal. Wexford Exhibit G (Dr. Sheaff dep) at 36. If a diabetic foot ulcer shows any signs of infection (redness, swelling, pain, pus), the person needs to see their doctor immediately. *Id.* at 31-33.

6.       A primary care doctor should refer a patient with a diabetic foot wound for specialty care. *Id.* at 37-38.

7.       It is important for people who have diabetes and neuropathy to have well-fitting shoes. Wexford Exhibit G (Dr. Sheaff dep) at 34. A poorly-fitting shoe could cause a blister to occur that could become an ulcer. *Id.* at 34. Wearing properly fitting shoes decreases the risk of getting an ulcer in the first place. *Id.* at 37; *see also* Plaintiff's Exhibit 1 (Dr. Kahn Report) ¶ 10 (supportive and well-fitting footwear is key to diabetic foot wound healing); Wexford Exhibit B (Dr. Powers 5/11/18 dep) 86-87 (it is important for diabetics to wear well-fitting shoes; shoes that are too tight or loose can rub or pinch and would not be good for a diabetic's foot); Plaintiff's Exhibit 2 (IDOC Office of Health Services, Chronic Illness Treatment Guidelines: Diabetes (May 2015) at II.D.3 (identifying "appropriate footwear" as a form of treatment for diabetics with neuropathy).

8.      IDOC standards of care call for "aggressive[]" treatment of foot ulcers in diabetic patients until the ulcer is healed." Plaintiff's Exhibit 2 (IDOC Office of Health Services Chronic Illness Treatment Guidelines, May 2015) at VI.E.1; *see also* Wexford Exhibit G (Dr. Sheaff dep) at 23-29 (agreeing with the standard of care set forth by IDOC); Plaintiff's Exhibit 1 (Dr. Kahn declaration) ¶ 1 (same).

9.      In this context, the term "aggressive" relates the urgency of timely responses when these wounds are identified. Plaintiff's Exhibit 1 (Dr. Kahn declaration) ¶ 1. Prompt and decisive action is key as the diabetic patient is especially vulnerable to infections and the complications that are associated with such infections. *Id.*

10.     The goal of medical treatment for diabetic foot ulcers is to react quickly so that the ulcer can be contained and given the best chance to heal. Wexford Exhibit I (Dr. Kahn dep) at 63.

11.     It is important for medical professionals to monitor diabetic foot ulcers closely and to document findings. Plaintiff's Exhibit 1 (Dr. Kahn Report) ¶ 3 ("Without proper documentation of the progress of the wound, it is my opinion that close monitoring of this ulceration would have been impossible for the attending doctor, and thus that doctor would not have the information needed to implement proper aggressive treatment of Mr. Rodesky's ulcerated blister."); Wexford Exhibit C (Dr. Tilden dep) at 90-91 (it is important for a doctor to closely monitor a diabetic foot ulcer because they can "go sour" quickly, becoming infected or worsening).

12.     Successful treatment of diabetic foot ulcers consists of three components: surgical debridement, offloading, and infection control. Wexford Exhibit G (Dr. Sheaff dep) at 82.

13.     Debridement consists of removing necrotic tissue, periwound, callous, and foreign bodies down to viable tissue. Wexford Exhibit G (Dr. Sheaff dep) at 82-83. Debridement is

necessary to decrease the risk of infection and reduce periwound pressure which can impede normal wound contraction and healing. *Id.* at 83.

14.     Even after a foot ulcer has healed, recurrence is common. Wexford Exhibit G (Dr. Sheaff dep) at 41. As one researcher put it, "it may be more useful to think of patients who have achieved wound closure as being in remission rather than being healed." *Id.* at 41.

15.     Someone who has had a diabetic foot ulcer, even if the wound ultimately heals and closes, is at a much higher risk of developing a future ulcer. *Id.* at 41-42.

**Plaintiff Develops Foot Ulcers at Tamms in 2011**

16.     In August 2011, Mr. Rodesky was housed at Tamms Correctional Center ("Tamms") that is now closed. Wexford Exhibit B (Dr. Powers 5/11/18 dep) at 10-11, 103.

17.     As a person with Type 1 diabetes, Mr. Rodesky would carefully monitor the condition of his feet because he knew that getting any kind of cuts or sores on his feet could lead to amputation. Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 7. He also knew it was important for people with diabetes to wear supportive well-fitting shoes, and he made a point to wear supportive sneakers that he purchased from the prison commissary. *Id.* ¶ 7; Wexford Exhibit A (Rodesky deposition) at 22-23.

18.     On August 17, 2011, IDOC security staff confiscated Mr. Rodesky's sneakers, leaving him with only one pair of state-issued shoes. Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 8. The state issued shoes were thin slip-ons in size 13, whereas Mr. Rodesky wore a size 6. *Id.*; Wexford Exhibit A (Rodesky dep) at 27-29.

19.     The only other shoes Mr. Rodesky had at the time were plastic slip on-shower sandals, which were like flip flops but without a strap between the toes. *Id.*

20.     Within days of his shoes being confiscated, Mr. Rodesky developed a large blister on the ball of his right foot. Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 9. Over the next several days the blister broke open and grew. *Id.*

21.     Mr. Rodesky submitted four medical requests to see Dr. Powers, dated 8/19/11, 8/21/11, 8/22/11, and 8/24/11. *Id.* ¶ 10. He also submitted emergency grievances about the issue on 8/21/11 and 8/26/11. *Id.* His grievances explained the substantial risk of harm he faced as a diabetic with open foot sores and specifically requested that Mr. Rodesky either receive his old sneakers or get a pair of diabetic approved sneakers. *Id.*

22.     The first medical provider who documented Mr. Rodesky's foot ulcer was Nurse Meade on August 22, 2011.Wexford Exhibit B (Dr. Powers 5/11/2018 dep) at 103; Wexford Exhibit D (medical records) at Bates 10. Nurse Meade "very likely" brought Mr. Rodesky's foot ulcer to Dr. Powers' attention right away. Wexford Exhibit B (Dr. Powers 5/11/18 dep) at 104.

23.     On August 26, 2011, another nurse noted Mr. Rodesky's complaints about his foot. Wexford Exhibit D at 0015. The nurse instructed Mr. Rodesky to keep his foot open to the air as much as possible. *Id.* She also notified Dr. Powers, who ordered bactrim, a topical antibiotic ointment. *Id.* Wexford Exhibit B (Dr. Powers 5/11/18 dep) at 108.

24.     Dr. Powers did not see Dr. Rodesky until 16 days later, on September 8, 2011, which Dr. Powers acknowledges was "tardy." Wexford Exhibit B (Dr. Powers 5/11/18 dep) at 104-05. Dr. Powers response was to provide Mr. Rodesky a topical foot cream. Plaintiff's Exhibit 4 (IDOC medical records) at Bates 31.

25.     Prior to this visit, Dr. Powers would have reviewed all of the nurse's notes about Mr. Rodesky's foot condition prior to seeing Mr. Rodesky. Wexford Exhibit B (Dr. Powers

5/11/18 dep) at 23-24. Whenever Dr. Powers saw a patient, he would review the nurse's notes about the patient since the last time he saw the patient. *Id.*

26. Mr. Rodesky's medical chart shows that nurses documented Mr. Rodesky's concerns about his foot ulcers on August 22 (open blister to right bottom of foot), August 26 (blister opened up on ball of foot), September 4 (toe swollen and possibly infected), September 7 (popped blisters on the bottom of foot and toe, noting redness and cracking). Plaintiff's Exhibit 4 (IDOC medical records) at 10, 15, 24-25, 28-29.

27. At the September 8, 2011 visit, Mr. Rodesky explained to Dr. Powers that he needed better shoes and that he was in a lot of pain. Plaintiff's Exhibit 3 (Rodesky declaration) ¶¶ 11, 13. Mr. Rodesky repeated both of these things every subsequent time he saw Dr. Powers during in 2011, but Dr. Powers did not order any pain medication for Mr. Rodesky's diabetic foot ulcers in 2011. Plaintiff's Exhibit 3 (Rodesky declaration) ¶¶ 11, 13, 14; Plaintiff's Exhibit 4 (IDOC medical records) at Bates 224-228, 269-275, 279 (medication administration records).

28. As a medical provider, Dr. Powers could have ordered diabetic shoes for Mr. Rodesky. Wexford Exhibit E (Dr. Powers 10/10/18 dep) 87-88.

29. Dr. Powers did not order diabetic shoes for Mr. Rodesky until June 2012, approximately 10 months after Mr. Rodesky's sneakers were confiscated, and only at the direction of an off-site doctor. Plaintiff's Exhibit 4 (IDOC medical records) at Bates 1499-1500 (noting on May 30, 2012 that outside doctor ordered diabetic shoes), Plaintiff's Exhibit 5 (Wexford utilization management records) at UMR 34 (diabetic shoes approved by Wexford on June 13, 2012). Mr. Rodesky received the diabetic shoes on July 24, 2012, more than a full year after his sneakers were confiscated. Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 12.

30. At his deposition in this case, Dr. Powers attempted to justify his failure to order diabetic shoes for Mr. Rodesky by claiming that Mr. Rodesky did not walk enough to need diabetic shoes. Wexford Exhibit E (Dr. Powers 10/10/18 dep) at 88-90.

31. Mr. Rodesky had to walk at Tamms in order to get his medication, take showers, and go to the yard. Plaintiff's Exhibit 3 (Rodesky declaration) at ¶¶ 4-6. As a person with diabetes, it was important for Mr. Rodesky to exercise on a regular basis. *Id.* ¶ 6; *see also* Wexford Exhibit B (Dr. Powers 5/11/18 dep) at 76-77.

32. The only way for Mr. Rodesky to exercise at Tamms was to go to yard and walk or play handball. Plaintiff's Exhibit 3 (Rodesky declaration) at ¶¶ 4-6; *see also* Wexford Exhibit B (Dr. Powers dep) at 93-94 (Dr. Powers would give prisoners at Tamms medical advice about running laps on the yard for exercise).

33. At the time Dr. Powers finally ordered diabetic shoes for Mr. Rodesky, he was confined to his cell 24 hours a day and was not walking at all as a result of his medical condition. Plaintiff's Exhibit 3 (Rodesky declaration) at ¶ 16.

34. Walking without proper shoes at Tamms during the summer and fall of 2011 caused Mr. Rodesky's foot ulcers to get worse. Plaintiff's Exhibit 3 (Rodesky declaration) at ¶ 14. It also caused him a lot of pain. *Id.* He would often skip yard because he was fearful of further damaging his feet. *Id.* Some ulcers got better but new ones would show up. *Id.*

35. During the fall of 2011, nurses made notes in Mr. Rodesky's chart about his ulcers on the following days: September 28 (reports foot not getting better, observes bottom of toe has open area approximately 1cm long and is purple, half dollar size pink area on bottom of foot that is warm to touch), September 30 (reports foot not improved, observes open area on bottom of toe, pink area on other toe), October 6 (reports foot not getting better, observed the pink area on the

bottom of his foot was getting larger and was still warm to touch), October 18 (report of pain, observing sores on his feet where shoes have rubbed, and observed blood in shoes and socks), October 22 (new sores on top of foot and outer aspect of foot), October 25 (noting open area on top of foot and underneath one toe, pink skin, slight swelling, and report of drainage), November 10 (report of toe bleeding and cracking, nurse removed gauze and skin came off, nurse advised plaintiff to put toilet paper between his toes), November 21 (reporting "my foot is getting worse every day"), November 27 (foot is hot and red). Plaintiff's Exhibit 4 (IDOC medical records) at Bates 53, 56, 63, 77, 83, 87, 95, 303-04, 314, 321.

**Plaintiff is Admitted to the Tamms Infirmary and is Non-Weight Bearing For Months**

36.    Mr. Rodesky's foot ulcers became so bad that he was admitted to the Tamms infirmary. Plaintiff's Exhibit 2 (Rodesky declaration) ¶ 15. He was in the infirmary continuously from sometime in January 2012 to December 23, 2012, which is the day he left Tamms for Pontiac. *Id.* ¶¶ 15, 18.

37.    When Mr. Rodesky was housed in the Tamms infirmary, nurses would bring his insulin shots directly to his cell. *Id.* ¶ 16. By spring 2012, his foot ulcer became so bad that he was non-weight bearing on his right foot and he could not walk. *Id.* In order to get to the toilet, he would hop on his left foot from his bed to his toilet. *Id.* He was not allowed to go to yard at all and he was not able to access a shower. *Id.* The only time he would leave his cell is when he would go for medical appointments outside of the prison and when that happened he was taken out in a wheelchair. *Id.*

38.    In November 2012 or December 2012, Mr. Rodesky was cleared to start trying to walk. *Id.* ¶ 17. At this time, he was very hard for him to try to walk because he had spent so many months not walking at all. *Id.* His muscles were weak and did not work like they used to. *Id.* In

addition, he did not have full use of his right foot—he could put pressure on his right toes only. *Id.* He was not given crutches or a walker or any assistive devices. *Id.*

39.     When patients spend a significant amount of time being non-weight bearing, they experience muscular atrophy and loss of strength, such that they need physical therapy to learn to re-learn to do basic things like getting out of bed and walking again. Wexford Exhibit G (Dr. Sheaff dep) at 66. Patients need physical therapy because they cannot figure out how to do those things on their own. *Id.* at 64, 66-67. When patients try to start walking again, they might have an altered gait that will result in low back pain or hip pain. *Id.* at 98-99.

40.     An outside doctor who had performed surgery on Mr. Rodesky's foot told Mr. Rodesky he should have physical therapy when he started walking again. Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 17. Dr. Powers did not arrange for Mr. Rodesky to have physical therapy when he started to walk again, instead he had to try figure out how to walk again inside of his cell on his own. *Id.*

41.     Mr. Rodesky eventually got to a point where he could walk approximately six steps across his cell, but he never walked any distance and he did not walk at all outside of his cell before leaving Tamms on December 23, 2012. *Id.*

**Plaintiff Arrives at Pontiac with an "Almost Healed" Foot Ulcer**

42.     When Mr. Rodesky left his infirmary cell at Tamms, he was taken out in a wheelchair and placed onto a bus to Pontiac. *Id.* ¶ 18. When the bus arrived at Pontiac, there was no wheelchair to meet him outside of the bus. Instead he had to walk to the Pontiac intake area. *Id.*

43.     At intake, Mr. Rodesky talked to Nurse Teresa Arroyo for a medical screening. *Id.* ¶ 19. He told her about his diabetic foot ulcer and surgeries and explained that he was light weight bearing and that he had not walked any distance for nearly a full year. *Id.* Arroyo told Mr. Rodesky

that he needed to talk to a doctor about getting a medical permit or accommodation and they discussed that Mr. Rodesky would be scheduled to see a doctor soon. *Id.*

44.     An IDOC document called an "Offender Health Status Transfer Summary" accompanied Mr. Rodesky from Tamms to Pontiac on December 23, 2013. Plaintiff's Exhibit 4 (IDOC medical records) at Bates 1984; *see also* Wexford Exhibit C (Tilden dep) at 50-53 (testifying about this document); Plaintiff's Exhibit 12 (Arroyo dep) at 11-13, 16 (same). The top portion of the document was filled out by medical staff at Tamms to reflect Mr. Rodesky's condition at the time of transfer, and the bottom part was to be filled out by receiving medical staff at Pontiac. Plaintiff's Exhibit 12 (Arroyo dep) at 11-19.

45.     At the top of the form, there is a line for "Current/Acute Conditions/Problems" and on that line medical staff wrote: "Right foot drsg daily; wound almost healed." Plaintiff's Exhibit 4 (IDOC medical records) at Bates 1984.

46.     In fact, Mr. Rodesky's foot at the time was not fully healed. Wexford Exhibit E (Dr. Powers 10/10/18 dep) at 111-114.

47.     There is also a line on the Offender Health Status Transfer Summary form for "Physical Disabilities/Limitations," and on that line medical staff wrote: "Light wt bearing on rt foot." Exhibit 4 (IDOC medical records) at Bates 1984.

48.     A "light weight bearing" patient is typically instructed that they can't put their full weight on the wound, so they have a cane or a walker or something to take the weight off the foot when they walk. Wexford Exhibit G (Dr. Sheaff dep) at 63-64.

49.     If the patient does not adhere to weight bearing restrictions, a diabetic foot wound may open back up, setting the patient behind in treatment. Wexford Exhibit G (Dr. Sheaff dep) at 65; *see also id.* at 43, 57-61 (The skin is normally weak just after an ulcer has healed. Even after a

diabetic foot ulcer is healed, the area may be fragile and the patient should not necessarily go back to full weight bearing).

50.     The Offender Health Status Transfer Summary also indicates that Mr. Rodesky needed "weekly" follow up care for his right foot and a specialty referral to "wound care clinic." Plaintiff's Exhibit 4 (IDOC medical records) at Bates 1984.

51.     Although Mr. Rodesky should have seen Dr. Tilden within 72 hours of his arrival at Pontiac, *see* Plaintiff's Exhibit 12 (Arroyo dep) at 19, he did not see Dr. Tilden until January 11, 2013. Plaintiff's Exhibit 3 (Rodesky declaration) at ¶ 30.

### Plaintiff's Foot Ulcer Reopens When He Has to Walk at Pontiac

52.     When Mr. Rodesky arrived at Pontiac, he was assigned to stay in a cell on "6 Gallery" in Pontiac's North Cell House (NCH), which was up three flights of stairs. *Id.* ¶ 21. After making his first walk from Pontiac's intake area to his cell, Mr. Rodesky's foot ulcer began bleeding. *Id.*

53.     At the time, Mr. Rodesky needed to take insulin injections twice a day. *Id.* ¶ 21. In order to get his insulin injections, he needed to walk approximately 50-75 yards from his cell, down several flights of stairs, and then walk to a nurse's station. *Id.* ¶ 22. After getting his injection, he would have to walk the same route in reverse back to his cell. *Id.* He had to make this trip two times a day for the first several months of his stay at Pontiac. *Id.*

54.     Having to make these trips every day caused Mr. Rodesky terrible pain, including on his right foot incision area, and over this time he observed the wound on his foot become progressively worse. *Id.*

55.     When Mr. Rodesky saw Dr. Tilden on January 11, 2013, he told him that his diabetic foot ulcer was getting worse because he had to walk in order to get his insulin shots and

that it was causing him pain. *Id.* ¶ 30. In response, Dr. Tilden said he would take care of it, or words to that effect, which Mr. Rodesky understood to mean that Dr. Tilden would issue a permit or make some other arrangement for him to take his insulin shots. *Id.* At this visit, Dr. Tilden observed minor "gaping" at the site of Mr. Rodesky's surgical scar and noted that it was slow healing. Wexford Exhibit G (Dr. Sheaff dep) at 69-73.

56.     Over the next few months, every time that Mr. Rodesky saw Dr. Tilden, he raised the issue about walking to get his insulin shots being harmful to his foot and causing him pain. *Id.* Over this time, Dr. Tilden did not provide him with adequate pain treatment. *Id.*

57.     On January 7, 2013, Mr. Rodesky filed an emergency grievance about the problem of his foot being harmed as a result of having to walk for his insulin shots. Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 29 (grievance attached as Declaration Exhibit E, including memo from Nurse Arroyo dated May 10, 2013). Nurse Arroyo wrote a memo dated May 10, 2013 in response to this grievance. *Id.* Her memo noted that Mr. Rodesky's low gallery permit was issued. *Id.*

58.     Security staff at Pontiac would have honored a medical permit issued by Dr. Tilden for Mr. Rodesky to be housed on low gallery. Plaintiff's Exhibit 9 (Pfister Dep) at 63-66; Plaintiff's Exhibit 12 (Arroyo dep) at 68-70.

**Plaintiff Needs to See A Specialist for His Foot but Has to Wait Several Months**

59.     According to Mr. Rodesky's Offender Health Status Transfer Summary, dated December 21, 2013, Mr. Rodesky needed "weekly" follow up care for his right foot and a specialty referral to "wound care clinic." Plaintiff's Exhibit 4 (IDOC medical records) at 1984. Dr. Tilden would have seen this document in Mr. Rodesky's medical chart. Wexford Exhibit C (Dr. Tilden dep) at 50-56, 208-209, 211-212.

60.     Although Dr. Tilden saw Mr. Rodesky several times between January 11, 2013 and April 5, 2013, Dr. Tilden did not request approval from Wexford for Mr. Rodesky to see a specialist until April 5, 2013. Wexford Exhibit D (medical records) at 2050.

61.     Pontiac medical staff did not send Mr. Rodesky's referral request for a surgical consult to New Jersey for approval until May 2, 2013. Plaintiff's Exhibit 7 (fax from Kathy Kissiar at Pontiac to Barry Slusser, dated 5/2/13). New Jersey approved the referral or Mr. Rodesky within three business days, on May 7, 2013, and notice of the approval was sent back to Pontiac's health care unit on May 7, 2013. Plaintiff's Exhibit 8 (email from Barry Slusser to Kathy Kissiar, dated 5/7/2013).

62.     Mr. Rodesky saw a specialist about his foot wound on September 12, 2013, which was more than 8 months after Mr. Rodesky's first meeting with Dr. Tilden. *Id.* ¶ 33.

63.     Wexford's retained expert, Dr. Sheaff, testified that if he had ordered the surgical consult for one of his patients, he would expect it to take place within a week, or maybe 2-3 weeks if there were no signs of infection. Wexford Exhibit G (Dr. Sheaff dep) at 80-81. According to Dr. Sheaff, if a specialist said he could not see his patient for six months, he would personally call the specialist, tell the specialist the problem is acute, and make sure his patient got in. *Id.* at 80.

64.     While Mr. Rodesky waited for his surgical consult appointment, the ulcer on his foot got worse and became infected. Plaintiff's Exhibit 3 (Rodesky declaration) at ¶ 33; Wexford Exhibit C (Dr. Tilden dep) at 140-147. The ulcer frequently oozed pus, had a foul-smelling odor, and caused pain. Plaintiff's Exhibit 3 (Rodesky declaration) at ¶ 33.

65.     An IDOC doctor who saw Mr. Rodesky on July 7, 2012 noted that the wound went to Mr. Rodesky's bone, and the diagnosed Mr. Rodesky with osteomyelitis, a bone infection.

Wexford Exhibit C (Dr. Tilden dep) at 118-119, 145-147; Wexford Exhibit D (medical records) at Bates 2060.

66.     When Mr. Rodesky's diabetic foot wound re-opened in 2013, it should have been managed aggressively because of his history of having a prior diabetic foot ulcer with a complicated course. Wexford Exhibit I (Dr. Kahn dep) at 119-120 ("While any ulceration in a diabetic presents a medical challenge, it is my opinion that Mr. Rodesky's case has demonstrated a complicated course and, therefore, I would expect his medical team to heighten their wound surveillance and care plan.  I feel that this was not the case.  . . . [I]f he has had a complicated course previously, he is more predisposed to have a complicated course in the future.")

## Plaintiff Faces Additional Delays Getting Follow Up Care

67.     When Plaintiff had his surgical consult with Dr. Igor Altman on September 13, 2013, Dr. Altman ordered an MRI for Plaintiff and for Plaintiff to return to see him after the MRI. Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 34. Dr. Altman also ordered a special off-loading non-weight bearing shoe for Mr. Rodesky's right foot. *Id.* As of October 21, 2013 Mr. Rodesky still had no received the MRI or the special shoe. *Id.* Around this time, Mr. Rodesky was in such severe pain that he had trouble concentrating and would often tear up. *Id.*

68.     Mr. Rodesky was not returned to Dr. Altman until January 16, 2014. *Id.* At that time, Dr. Altman observed that Mr. Rodesky's ulcer was "non-healing." Plaintiff's Exhibit 4 (IDOC medical records) at Bates 2799.

69.     Dr. Altman surgically debrided Mr. Rodesky's wound and ordered Rodesky to come back in four weeks. *Id*; Plaintiff's Exhibit 3 (Rodesky declaration) at ¶ 35. He also ordered Mr. Rodesky to begin taking antibiotics. Plaintiff's Exhibit 4 (IDOC medical records) at Bates 2796.

70.     Dr. Tilden agreed with the plan for Mr. Rodesky to be returned to Dr. Altman within four weeks and for Mr. Rodesky to begin taking antibiotics. *Id.* at Bates 2796.

71.     Six weeks later, on February 27, 2014, Mr. Rodesky had still not been sent back to see Dr. Altman so he wrote a grievance. Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 35. At that point, his wound appeared infected—it was red, inflamed, swollen, and had a foul-smelling order. *Id.* Mr. Rodesky was also in constant pain that caused him trouble sleeping and concentrating and he could not put any foot on his weight at all. *Id.*

72.     Around this time, Mr. Rodesky would talk to NCH med techs frequently about his foot and they told him they had brought the issue to Dr. Tilden's attention. *Id.* at ¶ 36.

73.     Notwithstanding Dr. Altman's prior order that Mr. Rodesky be returned within four weeks of January 16, he was not seen again by Dr. Altman until April 10, 2014. Plaintiff's Exhibit 4 (IDOC medical records) at Bates 2802.

74.     On April 10, 2014, Dr. Altman observed that the wound was still non-healing and recommended hospital admission for further work up. *Id.* Dr. Tilden signed off in agreement with that plan. *Id.*

75.     Dr. Altman also recommended that Mr. Rodesky see an orthopedist at UIC within one week, and an appointment was made for him to see Dr. Altman on April 7, 2014. *Id.* at Bates 2802-03. Plaintiff's Exhibit 14 (UIC medical records) at Rodesky 3545. At that time, Dr. Tilden agreed that Mr. Rodesky should see an orthopedist within 7 days. Plaintiff's Exhibit 4 (IDOC medical records) at Bates 2521.

76.     Mr. Rodesky was not brought to his April 17, 2014 appointment with orthopedist Dr. Mejia however; Dr. Tilden did not even request approval from Wexford for the appointment until April 17, 2014. *Id.* at Bates 2524.

77.     When Mr. Rodesky returned from his April 10, 2014 visit with Dr. Altman, Dr. Tilden ordered him to be placed on antibiotics. *Id.* at Bates 2523. However, Mr. Rodesky did not receive those antibiotics, and complained about it when he presented at Pontiac's "urgent care" on May 6, 2014. *Id.* at Bates 2529, 2848-2849,

78.     Mr. Rodesky did not see Dr. Mejia until May 8, 2014, at which time Dr. Mejia found "unfavorable changes" with Mr. Rodesky's heel ulceration, "new osteomyelitis" of the heel bone, and observed purulence and foul-smelling odor at the would site. Plaintiff's Exhibit 14 (UIC medical records) at Rodesky 3499-3500. Mr. Rodesky also complained of recent fever, chills, and diarrhea. *Id.* That day Dr. Mejia decided to admit Mr. Rodesky to UIC hospital. *Id.*

79.     After spending several days in the hospital, Mr. Rodesky returned to Pontiac, where he spent 3-4 months in Pontiac's infirmary. Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 37. In the Pontiac infirmary, he was again non-weight bearing for a significant period of time. *Id.*

80.     While Mr. Rodesky was in the infirmary, he had several follow up appointments with Dr. Mejia. At a follow up visit on June 19, 2014, Mr. Rodesky left with orders for diabetic shoes, compression hose, and to come back in one week. Plaintiff's Exhibit 14 (UIC medical records) at Rodesky 3629-30.

81.     When Mr. Rodesky returned for follow up on June 26, 2014, it was noted that he still had not received his diabetic shoes or compression hose. *Id. at* Rodesky 3630. Dr. Mejia requested for him to return in 2 weeks, and Dr. Tilden agreed with the plan to return him within 2 weeks. Plaintiff's Exhibit 15 (UIC medical records) at Rodesky 3627-28; Plaintiff's Exhibit 4 (IDOC medical records) at Bates 2652.

82.     However, Mr. Rodesky was not sent back to Dr. Mejia until July 24, 2014. Plaintiff's Exhibit 14 (UIC medical records) at Rodesky 3625-26. At this time, Mr. Rodesky's

wound was "almost fully healed" and he was scheduled to follow up in 4 weeks. *Id.* Dr. Tilden agreed with the plan for him to follow up at UIC in 4 weeks. Plaintiff's Exhibit 4 (IDOC medical records) at Bates 2911. This 2014 follow up visit never happened. *Id.* at Bates 3061-62.

83. Mr. Rodesky was discharged from the Pontiac infirmary around September 12, 2014. Plaintiff's Exhibit 3 (Rodesky declaration) at ¶ 37.

84. During September and October 2014, Mr. Rodesky experienced a lot of severe pain. *Id.* ¶ 38. Mr. Rodesky believed that the pain was from nerve damage to his foot resulting from surgery and also because he had to teach himself to walk again after a period of having been non-weight bearing. *Id.*

85. In early October 2014, Dr. Tilden discontinued Mr. Rodesky's pain medication without talking to him about it. *Id.* Mr. Rodesky asked a med tech in his cell house to ask Dr. Tilden to renew his pain medication, but Dr. Tilden refused. *Id.* As a result, Mr. Rodesky went without any prescription pain medication for approximately 11 days. *Id.* The pain was so terrible that Mr. Rodesky put in a request to see Dr. Tilden, and he saw him on October 11, 2014. *Id.* Dr. Tilden ordered new pain medication for Mr. Rodesky during this visit: Ultram and Flexeril, but Mr. Rodesky never received the Flexeril. *Id.*

86. On October 30, 2014, Mr. Rodesky saw a different provider who changed his pain medication again, telling him that Ultram and Flexeril were not appropriate for him, and prescribing Indocin for instead. *Id.* Mr. Rodesky did not receive the new pain medication for several days. *Id.*

**Plaintiff's Foot Ulcer Opens for A Third Time,**
**Becomes Infected, and Results in A Below Knee Amputation**

87.     On November 2, 2014, Mr. Rodesky noticed cracked skin around the surgical site on his right foot. *Id.* ¶ 39. He showed the to the med techs and a nurse who made rounds in his cell house, and each of them told him that they brought the issue to Dr. Tilden's attention. *Id.*

88.     Soon the skin started peeling around the site of Mr. Rodesky's surgical scar, causing him a lot of pain. *Id.* Throughout November 2014, he made every effort get Dr. Tilden's attention about this issue, but Dr. Tilden never arranged to see him. *Id.*

89.     In December 2014, the cracks on Mr. Rodesky's right foot continued to get worse and then started bleeding. Plaintiff's Exhibit 3 (Rodesky declaration) ¶ 40. In addition to cracks around the area of his surgical site, he also developed cracks between his toes. *Id.*

90.     As Wexford's retained expert acknowledges, early recognition of new lesions in a patient with a previous diabetic foot ulcer is critically important for reducing the risk of complications. Wexford Exhibit G (Dr. Sheaff dep) at 144-145. Callus, especially if hemorrhagic (bleeding), is such a lesion. *Id.*

91.     Mr. Rodesky was scheduled to be seen for "urgent care" on several occasions in December 2014, but medical records indicate he was not seen on those dates, due to "lockdown." Plaintiff's Exhibit 4 (IDOC medical records) at Bates 3133-3135.

92.     At times the Pontiac cell houses would go on "lockdown" and prisoners' movement was restricted. Wexford Defendant's Exhibit C (Dr. Tilden deposition) at 22-23. When that happened, Dr. Tilden could and would make rounds inside the cell houses so that patients who needed medical attention could still be seen. *Id.*

93.     Dr. Tilden made rounds in NCH on at least one occasion in December 2014, but did not see Mr. Rodesky. Plaintiff's Exhibit 3 (Rodesky declaration) at ¶ 41.

94.    Mr. Rodesky was not seen by a clinician until December 24, 2014. *Id.* at ¶ 42. On that date, a cell house lieutenant ordered officers to take Mr. Rodesky to the health care unit and to not bring him back to the cell house until after he was seen by a medical professional. *Id.*

95.    The provider that Mr. Rodesky saw on December 24 observed that he had scaling necrotic (dead) tissue on his "old wound," with fissures, including between the toes. Plaintiff's Exhibit 4 (IDOC medical records) at Bates 3136. The provider performed debridement. *Id.*

96.    Between October 2013 and December 2014, Mr. Rodesky filed several grievances about delays in treatment for his diabetic foot ulcers, about medical staff's inattention to his condition. Plaintiff's Exhibit 3 (Rodesky declaration) at ¶¶ 29, 33-35, 38-39.

97.    Mr. Rodesky went back to see Dr. Mejia at UIC on January 14, 2015. Plaintiff's Exhibit 14 (UIC medical records) at Rodesky 3623-24. Dr. Mejia observed some "open" cracking on Mr. Rodesky's heel and cracks between some of his toes. *Id.* Dr. Mejia ordered special dressings and for Mr. Rodesky to return to see him in one week. *Id.*

98.    On January 16, Dr. Tilden agreed with the plan for Mr. Rodesky to return to Dr. Mejia in one week, but Mr. Rodesky did not return to Dr. Mejia until nearly eight weeks later, on March 12, 2015. Plaintiff's Exhibit 4 (IDOC medical records) at Bates 3141; Plaintiff's Exhibit 14 (UIC medical records) at Rodesky 3621-22.

99.    On March 12, 2015, Dr. Mejia observed that the ulcer was not healing. Plaintiff's Exhibit 14 (UIC medical records) at Rodesky 3621-22. He ordered Mr. Rodesky to have an MRI followed by a surgical procedure, which Dr. Mejia scheduled for April 3, 2015. *Id.*

100.    Just before the April 3, 2015, however, Dr. Mejia discovered that Mr. Rodesky had osteomyelitis again and determined that Mr. Rodesky would therefore need to see an infectious disease specialist before surgery. *Id.* at Rodesky 3617.

101.     Dr. Mejia performed surgical procedures on April 17, 2015 and again on May 8, 2015. *Id.* at Rodesky 1085-87, 3602-03.

102.     On May 8, 2015, Dr. Mejia admitted Mr. Rodesky to the UIC hospital where he stayed until May 13, 2015. Plaintiff's Exhibit 4 (IDOC medical records) at Bates 2811-12. The May 13, 2015 hospital discharge instructions indicate that Mr. Rodesky should return for a follow up in one week. *Id.*

103.     Instead of returning to see Dr. Mejia in one week as ordered, Mr. Rodesky stayed in the Pontiac infirmary until June 10, 2015, when he became ill with fever and serious signs of infection and was taken to a local emergency room. Plaintiff's Exhibit 4 (IDOC medical records) at Bates 4103.

104.     From the emergency room, Mr. Rodesky was transferred and admitted to UIC hospital on June 11, where he again underwent several surgical procedures, including a partial calcanectomy (removal of part of the heel). Plaintiff's Exhibit 14 (UIC medical records) at Rodesky 663-667, 736-746. During this time at UIC, doctors discussed with Mr. Rodesky the possibility that he would need an amputation in the future, but that the more conservative calcanectomy should be tried first. *Id.* at Rodesky 737-38. Mr. Rodesky was discharged back to Pontiac on June 26, 2015. *Id.* at Rodesky 736-746.

105.     Soon after Plaintiff' return to Pontiac, starting around July 2, 2015, he became very ill, with nausea, vomiting, and additional foot sores. Plaintiff's Exhibit 4 (IDOC medical records) at Bates 3245, 3236, 2237-38, 3334, 3340-44, 3355, 3365.

106.     On July 10, Mr. Rodesky returned to see Dr. Mejia, and Dr. Mejia again admitted him to UIC hospital. Plaintiff's Exhibit 4 (IDOC medical records) Bates 3750-55. When he showed up for this visit, he was extremely ill, in a state of sepsis. Wexford Exhibit C (Dr. Tilden dep) at

169-183. In order to be finally rid of the infection, Mr. Rodesky decided during this hospital stay to have a below knee amputation, which occurred on July 15, 2015. Exhibit 4 (IDOC medical records) Bates 3750-55; Wexford Exhibit C (Dr. Tilden dep) at 169-183.

## Miscellaneous

107.    As the site medical directors, Dr. Tilden and Dr. Powers were responsible for leading and overseeing the entire medical practice at Pontiac Correctional Center and Tamms Correctional Center, respectively. Plaintiff's Exhibit 6 (Wexford Medical Director Job Description) at 1. They were ultimately responsible for all health care delivered at the site. *Id.* at 1. They were responsible for ensuring the timeliness and implementation of appropriate medical care, addressing all administrative issues that arise at the site, and coordinating services of other on-site medical providers. *Id.* at 1.

108.    Plaintiff's retained expert, Dr. Evan Kahn reviewed all the medical records in this case and opined that Dr. Powers and Dr. Tilden deviated from the standard of care in several ways with respect to Mr. Rodesky's care. Plaintiff's Exhibit 1 (Dr. Kahn declaration and report).

109.    In particular, Dr. Kahn opined that Dr. Powers and Dr. Tilden did not treat Mr. Rodesky's wounds timely and aggressively, as the standard of care requires, during the periods when Mr. Rodesky's wounds were first opening (or re-opening). *Id.* at Report ¶ 1 (lack of aggressive treatment in 2011); *id.* ¶ 9 (noting the need for heightened surveillance and care in 2013 given his past demonstrated complicated course of care); at ¶ 11 (failure to respond in a timely and aggressive manner in 2014).

110.    As Dr. Kahn explained, "Prompt and decisive action is key as the diabetic patient is especially vulnerable to infections and the complications that are associated with such infections." *Id.* at Report ¶ 1; *see also id.* ("Diabetic ulcerations are a significant source of

morbidity and mortality to the diabetic patient. The cases are defined by the need for close observation and documentation as well as aggressive management at the onset of infection or worsening.").

111.    Dr. Kahn further opined that these deviations from the standard of care caused and contributed to Mr. Rodesky's ultimate need for an amputation of his right leg. *Id.*

112.    At his deposition in this case, Dr. Tilden referred to Mr. Rodesky as his "number one patient" from the time that Mr. Rodesky arrived at Pontiac and through his surgery. Wexford Exhibit C (Dr. Tilden dep) at 13. This was because Dr. Tilden had a lot of contact with him and because he needed so much care. *Id.*

## Argument

### I.    Summary Judgment Standard

Summary judgment is warranted if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden to establish that no material facts are in genuine dispute. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970). Any doubt as to the existence of a genuine issue is resolved against the moving party. *Id.*

### II.    Defendants are Not Entitled to Summary Judgment

To prevail on an Eighth Amendment claim, Plaintiff must show that the responsible prison official was deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 835, 837 (1994); *Nyman v. Winnegabo County*, 165 F.3d 587, 590 (7th Cir. 1999). In this case, Defendants do not dispute that Plaintiff had serious medical needs. Rather, Defendants argue that Plaintiff received so much medical care that the there is no way he can establish deliberate indifference. Doc. 90 at 45.

While it is true that Plaintiff received a lot of care – after all, he suffered from an extremely serious chronic medical condition spanning a period of over five years – the fact that he received care does not negate deliberate indifference. *See Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)("[W]e have rejected the notion that the provision of some care means the doctor provided medical treatment which meets the basic requirements of the Eighth Amendment."); *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000) (prisoner is not required to show that he was literally ignored). Plaintiff acknowledges periods that he adequate medical care, in particular when he where he was under the closely monitored care of outside medical specialists. However, reviewing the facts in the record in the light most favorable to Plaintiff shows that Dr. Powers and Dr. Tilden exhibited deliberate indifference during crucial periods of the progression of Plaintiff's foot ulcer, especially when his foot ulcer first opened (and then later re-opened) and outside medical providers were not closely involved in Plaintiff's care.

To establish deliberate indifference, Plaintiff must show that Drs. Powers and Tilden knew of and disregarded an excessive risk to his health. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Plaintiff need not show that they intended or desired the harm that transpired. *Id.* Instead, it is enough to show that they knew of a substantial risk of harm and disregarded the risk. *Id.* To put it another way, Plaintiff must show that Defendants' responses to his condition were "so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008).

### A. Facts in the Record Support a Jury Finding that Dr. Powers Was Deliberately Indifferent to Plaintiff's Serious Medical Needs

A jury could find that Dr. Powers acted with deliberate indifference to Plaintiff's serious medical needs when he failed to provide him with proper footwear, persisted in an obviously

ineffective course of treatment, failed to treat his pain, and failed to provide post-surgical physical therapy for Plaintiff.

### 1. Failure to Order Diabetic Shoes

When Plaintiff was under Dr. Powers's care, he had a serious medical need for well-fitting supportive footwear. Dr. Powers and the retained experts on both sides of this case all agree that it is important for people with diabetes and neuropathy to wear well-fitting supportive shoes. Plaintiff's Statement of Material Facts ("PSMF") ¶ 7. IDOC's diabetes treatment guidelines also identify "appropriate footwear" as a form of treatment for diabetics with neuropathy. *Id.* Without proper footwear, a diabetic might develop a foot ulcer (skin opening). *Id.*

Foot ulcers are very risky for people with diabetes: when a person with diabetes gets a foot ulcer, they face a significant risk of needing an amputation. *Id.* ¶ 1. When a diabetic gets a foot ulcer, it important to avoid doing anything that puts pressure on the area because pressure inhibits healing and can make the wound worse. *Id.* ¶ 4.

Plaintiff had purchased a pair of shoes for himself from commissary that were adequate, but in August 2011 those shoes were confiscated. *Id.* ¶¶ 17-18. As a result, Plaintiff had only ill-fitting, unsupportive shoes to wear, which caused him to develop a foot blister. *Id.* ¶¶ 19-20

Plaintiff brought this blister to the attention of Tamms medical staff immediately and filed two emergency grievances. *Id.* ¶¶ 21-22. Although Plaintiff did not see Dr. Powers in person about this issue until September 8, 2011, a nurse "very likely" told Dr. Powers about the ulcer on August 22 and definitely by August 26. *Id.* ¶¶ 22-23. Every time that Mr. Rodesky saw Dr. Powers for foot ulcers during the fall of 2011, he told him that his ill-fitting shoes were causing foot ulcers. *Id.* ¶ 27.

Dr. Powers had the ability to order diabetic shoes for Plaintiff from Wexford, but he did not order them until approximately 10 months after Plaintiff's ulcer first appeared, and he did so only after an outside doctor said that Mr. Rodesky needed them. *Id.* ¶¶ 28-29. At his deposition in this case, Dr. Powers attempted to justify his failure to order diabetic shoes earlier by claiming that Plaintiff did not walk enough at Tamms for him to need well-fitting supportive shoes. *Id.* ¶ 30. A jury could easily reject this post hoc rationalization.

Obviously, Mr. Rodesky walked enough to develop an ulcer on his foot, and thus he walked enough to require properly fitting and supportive footwear. In particular, Mr. Rodesky needed to walk in order to get his twice-daily insulin injections, to get to the shower, and to get to yard. *Id.* ¶¶ 31-32. It was important for Mr. Rodesky to go to yard because it was his only opportunity for exercise, which he needed to control his diabetes. *Id.* Furthermore, the fact that an outside doctor ordered diabetic shoes for Mr. Rodesky in mid-2013, when he was doing hardly any walking at all, *id.* ¶¶ 29, 33, suggests that there is no minimal amount of walking a diabetic patient must do in order for that person to need well-fitting supportive shoes.

As a result of not having adequate footwear, Plaintiff's diabetic foot ulcers became worse and his pain worsened, which is exactly what a person with medical training would expect to happen. *Id.* ¶¶ 7, 34. While some of his ulcers healed, new ones developed in different areas of his feet, and his condition grew progressively worse. *Id.* ¶¶ 34-35; Defendants' Statement of Material Facts ("DSMF") at ¶¶ 15-47.

It is well-established that failure to provide medically necessary assistive devices can constitute deliberate indifference. *Petties v. Carter*, 836 F.3d 722, 732 (7th Cir. 2015) (a prison doctor's refusal to provide a patient with a ruptured tendon with a boot or splint could constitute deliberate indifference); *Hotchkiss v. Woods*, 713 Fed. Appx. 501, 504 (7th Cir. 2017) (a prison

doctor's delay in providing a patient with a cane and boot to treat the patient's different length legs could constitute deliberate indifference); *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) (a prison doctor's refusal to order a bland diet for a prisoner with gastrointestinal issues could support a finding of deliberate indifference); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (a prison doctor's refusal to provide a patient with nerve blockage with a sling and other accommodations could constitute deliberate indifference).

In *Petties*, the Seventh Circuit held that a jury could reasonably conclude that prison doctor was deliberately indifferent to a patient's serious medical needs when he decided not to provide the patient with a boot or splint to hold his ruptured Achilles tendon in place, causing, in the patient's words, "constant, severe pain." 836 F.3d at 732. In that case, the defendant doctor and the plaintiff's orthopedic specialist both testified to the importance of immobilizing the ankle to promote healing and prevent re-injury, noting that the "circumstantial evidence support[ed] a reasonable inference that [the defendant doctor] knew that failure to immobilize an Achilles rupture would impede [the plaintiff's] recovery and prolong his pain." *Id.* In this case, as laid out above, Plaintiff's expert, Defendants' own expert, and Dr. Powers all testified that it is important for diabetics to wear well-fitting shoes to treat and prevent ulceration and re-ulceration. PSMF ¶ 7. These facts are more than sufficient to support a jury finding that Dr. Powers was deliberately indifferent to Plaintiff's serious medical needs. Dr. Powers is not entitled to summary judgment.

## 2. Delay and Persistence in an Ineffective Course of Treatment

While it is clear that Plaintiff needed medically necessary footwear, it is also clear that because Dr. Powers refused to provide him with that footwear, Plaintiff went on to develop new blisters and his condition worsened. In the fall of 2011, Dr. Powers persisted in an ineffective

course of treatment, which is another hallmark of deliberate indifference. *See e.g.*, *Petties*, 836 F.3d at 729-730; *Greeno*, 414 F.3d at 654.

IDOC's clinical guidelines, call for "aggressive" treatment of diabetic foot ulcers, and experts on both sides agree with this standard. PSMF ¶ 8. In this context, "aggressive" means a prompt and timely response, especially given the fact that diabetic foot ulcers can "go sour" quickly, and people with diabetes are especially vulnerable to infections and complications associated with infections. *Id.* ¶¶ 9, 11. Aggressive treatment involves referral for specialty care, debridement (surgical removal of necrotic tissue), offloading, and infection control. *Id.* ¶¶ 6, 12, 13. Debridement decreases the risk of infection and periwound pressure that can impede healing. *Id.* ¶ 13. The goal of treatment is to contain the ulcer and give it the best chance to heal. *Id.* ¶ 10.

Dr. Powers first learned about Plaintiff's foot ulcer on August 22, *id.* at 22, but he did not see him until Septemeber 8, which even Dr. Powers admits was "tardy." *Id.* at ¶ 24. That day, Dr. Powers ordered only a topical cream for Plaintiff. *Id.* Dr. Powers did not order any antibiotics for Plaintiff until October 7, nearly six weeks after Plaintiff's ulcer first appeared, and well after he was exhibiting signs of infection (pain, redness, swelling, drainage, etc.). *Id.* ¶¶ 23-26, 35. Even after receiving the antibiotics, Plaintiff's medical records show a worsening of symptoms, including the appearance of new ulcers. *Id.* ¶ 35. The ulcers persisted through November and December, being treated primarily with topical ointments only. DSMF ¶¶ 19-33.

Finally, on December 20—nearly four months after Plaintiff's ulcers first appeared—Dr. Powers for the first time referred Plaintiff to a specialist. *Id.* ¶ 29. Mr. Rodesky went for his appointment with the outside surgeon on December 22, at which point he was diagnosed with an

infected cyst. *Id.* ¶ 33. As Plaintiff's expert Dr. Kahn opined,[1] this course of treatment does not reflect "aggressive" treatment of Mr. Rodesky's foot ulcer. PSMF ¶ 109 (citing Dr. Kahn's Report ¶ 1). Dr. Kahn further opined that Dr. Powers delay in initial care modification directly contributed to the worsening of Plaintiff's ulcer and ultimate infection. *Id.* These facts support a finding that Dr. Powers' persistence in an ineffective course of treatment constituted deliberate indifference.

### 3. Failure to Treat Pain

Facts in the record also support finding that Dr. Powers was deliberately indifferent to Plaintiff's pain. Plaintiff told Dr. Powers about pain associated with his foot ulcer during their first meeting on September 7, 2011 and every meeting thereafter throughout the fall of 2011. *Id.* ¶¶ 27, 34. During this period, Dr. Powers provided no treatment for Mr. Rodesky's pain. *Id.* ¶ 27. Delays or refusals to treat painful medical conditions, even if non-life-threatening, can support an Eighth Amendment claim. *Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816, 829 (7th Cir. 2009) (citing *Gutierrez v. Peters*, 111 F.3d 1364 (7th Cir. 1997)). A jury could find that Dr. Powers was deliberately indifferent to Plaintiff's pain by failing to treat it.

### 4. Failure to Provide Post-Surgical Physical Therapy

Finally, facts in record also support a jury finding that Dr. Powers was deliberately indifferent to Plaintiff's serious medical needs by not arranging for him to have post-surgical physical therapy in 2012. For a period of approximately 10 months, Plaintiff was housed in the Tamms infirmary while undergoing a series of surgeries to the bottom of his foot and was

---

[1] Defendants take issue with Dr. Kahn's reference to professional standards of care, *see* Doc. 90 at 51, but their position misunderstands the role that professional standards play in the deliberate indifference analysis. While deviation from a professionally accepted standard of care is not *per se* deliberate indifference, it is it circumstantial evidence that can support a finding of deliberate indifference. *E.g.*, *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (published treatment protocols provide circumstantial evidence that doctor knew of a substantial risk of serious harm).

completely non-weight bearing. DSMF ¶¶ 32-132; PSMF ¶¶ 36-36. In November or December 2012, he was cleared to begin trying to walk, but it was very hard for him because his muscles had atrophied and did not work like they used to, he could only use part of his right foot (the toes), and he was not provided crutches, a walker, or any assistive devices. PSMF ¶ 38. A doctor who performed surgery on Plaintiff's foot told him he would need physical therapy when he was relearning to walk. *Id.* ¶ 40. As Defendants' expert acknowledged, physical therapy is needed after a person is transitioning from non-weight bearing status after surgery. *Id.* ¶ 39. This is because being non-weight bearing causes a person's muscles to atrophy; they need physical therapy to learn how to walk because they cannot do it on their own. *Id.*

In *Petties v. Carter*, 836 F.3d 722, 733 (7th Cir. 2016) the Seventh Circuit held that a prison doctor's failure to provide post-surgical physical therapy could support an Eighth Amendment claim. In *Petties*, a specialist recommended physical therapy after treatment for a ruptured Achilles tendon, and in this case Plaintiff's surgeon recommended the same (and Defendants' expert explained why it would be needed in this circumstance). Dr. Powers remained very involved in Plaintiff's care while he was struggling to learn to rewalk, DSMF ¶¶ 149-64, and therefore certainly would have understood his need for physical therapy. Dr. Powers was also responsible for coordinating all patient care at Tamms, such that an order for physical therapy would need to come from him. PSMF ¶ 107. A jury could find Dr. Powers deliberately indifferent for failing to order physical therapy for Plaintiff.

**B. Facts in the Record Support a Jury Finding that Dr. Tilden Was Deliberately Indifferent to Plaintiff's Serious Medical Needs**

A jury could also find that Dr. Tilden was deliberately indifferent to Plaintiff in certain aspects of his care, in particular by failing to timely issue Plaintiff a low gallery permit, allowing unacceptable delays in Plaintiff's care, and failing to treat Plaintiff's pain.

### 1. Failure to Issue a Low Gallery Permit

Dr. Tilden was aware from the first time that he saw Plaintiff on January 11, 2013 that he had a medical need to stay off his right foot. PSMF ¶¶ 44-48 (Plaintiff's "Offender Health Status Transfer Summary" noted that Plaintiff had an "almost healed" wound on his right foot and was designated light weight bearing);[2] *id.* ¶ 59 (this document was in Plaintiff's medical chart, which Dr. Tilden would have looked at); *id.* ¶¶ 55-56 (Plaintiff told Dr. Tilden about his problem walking during January 11, 2013 visit and during subsequent appointments).

Dr. Tilden also would have known that Plaintiff also faced a substantial risk of serious harm by walking on his right foot. As Defendants' expert acknowledged, if a patient does not adhere to weight bearing restrictions, a diabetic foot wound may open back up, setting the patient back in treatment, as the skin is normally week just after an ulcer has healed. *Id.* ¶ 49. In addition, soon after Plaintiff's arrival at Pontiac, Mr. Rodesky's "almost healed" wound re-opened as a result of having to walk to get his insulin shots. *Id.* ¶¶ 52-54. As Defendants' expert also testified (and Dr. Powers agreed), it is extremely important for people with diabetic foot ulcers to "off-load" and keep pressure off the affected area. *Id.* ¶ 4.

During this time, it was within Dr. Tilden's power as Pontiac's medical director to issue a "low gallery permit" for Plaintiff, and Pontiac security staff would have honored the permit. DSMF ¶ 184; PSMF ¶ 58. Under these circumstances, Dr. Tilden's failure to timely issue the permit was an "inexplicable delay . . . which serve[d] no penological interest." *Petties*, 836 F.3d at 730 (whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment). Given the seriousness of Plaintiff's condition and how easy it

---

[2] A "light weight bearing" patient typically has a walker or something to take the weight off the foot when they walk. PSMF ¶ 48.

would have been for Dr. Tilden to write a low gallery permit, this "inexplicable delay" supports an inference of deliberate indifference. *Id.*; *see also Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (given the ease of supplying a prisoner with over-the-counter pills to treat his gastro-esophageal reflux disease, failing to do so for two months created a fact question over deliberate indifference).

It is unclear why Dr. Tilden waited five months to issue the permit. It should be noted however, that on January 7, 2013, soon after Plaintiff arrived at Pontiac, he filed an emergency grievance about the fact that having to walk at Pontiac was causing his ulcer to re-open. PSMF ¶ 57. In response to the grievance, Nurse Arroyo wrote a memo, dated May 10, 2013—the day after Dr. Tilden issued the low gallery permit—saying that the permit was issued. *Id.* These facts support an inference that Plaintiff's grievance is what finally prompted Dr. Tilden to issue the permit. The fact that Dr. Tilden issued the permit only when Plaintiff's grievance reached the medical unit (and not in the course of Dr. Tilden's clinical interactions with Plaintiff) also supports an inference that Dr. Tilden simply was not taking Plaintiff's concerns seriously during their clinical encounters. It was only when Dr. Tilden was confronted with an unfavorable paper trial that he was motivated to act. All of these facts support an inference that Dr. Tilden was deliberately indifferent in his failure to timely issue a low gallery permit.

### 2. Delays in Care

Throughout the course of Plaintiff's treatment at Pontiac, he confronted a series of delays in accessing outside medical treatment, causing Plaintiff to experience continuing pain, infections, and postponing his access to appropriate "aggressive" treatment. These delays also support a finding of deliberate indifference. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("A

delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged the inmate's pain.")

### a. Delay in Getting Appropriate Medical Care When Plaintiff's Foot Ulcer Reopened in 2013

Plaintiff's "Offender Health Status Transfer Summary" (discussed above) plainly stated that Plaintiff needed "weekly" follow up care and "specialty referral" to a wound care clinic. PSMF ¶ 59. As discussed above, Dr. Tilden would have reviewed this document when he first met Plaintiff on January 11, 2013, clearly putting him on notice of the need for these medical services. Additionally, Plaintiff told Dr. Tilden on January 11 that his foot ulcer was worsening and causing him pain. *Id.* ¶ 55. Dr. Tilden also personally observed minor "gaping" at the surgical site and that the wound was "slow healing." DSMF ¶ 169.

Notwithstanding this information, Dr. Tilden did not request a specialty referral until several months later, on April 5, 2013. PSMF ¶ 60. Failure to timely refer a patient to an outside specialist can support a finding of deliberate indifference. *See McGowan*, 612 F.3d 640 (delayed referral and scheduling with outside specialist can form the basis of an Eighth Amendment claim); *Greeno*, 414 F.3d at 655 (delay in referring a patient to an outside specialist can support a finding of deliberate indifference); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (prison doctor's delay in sending a patient with severe arm pain to an orthopedic surgeon and neurosurgeon as a factor in reversing summary judgment in doctor's favor).

There is no justification Dr. Tilden's delay in requesting a specialty referral—it is not as if Plaintiff's condition was getting better—quite the opposite, it was worsening over time and Plaintiff's pain persisted. *Id.* ¶¶ 54, 56; DSMF ¶¶172, 176, 177. In light of Plaintiff's prior complicated history with the ulcer, Dr. Tilden should have heighted his surveillance and care plan, but he failed to do so. PSMF ¶ 66.

Even after Dr. Tilden requested the specialty referral, it took an additional five months for Plaintiff to be seen by the specialist, such that he was not seen until September 13, 2013. DSMF ¶ 194. Over this period of time, Plaintiff developed infections, experienced severe pain, and his wound worsened. PSMF ¶ 64. One doctor who saw him over this period observed the wound go to the bone and diagnosed osteomyelitis, a bone infection. *Id.* ¶ 65.

Defendants' expert Dr. Sheaff testified at his deposition that if he ordered a surgical consult for a patient, he would expect it to take place within a week, or maybe 2-3 weeks if there were no signs of infection. *Id.* ¶ 63. According to Dr. Sheaff, if a specialist said he could not see the patient for six months, he would personally call the specialist, tell them the problem was acute, and make sure his patient go in. *Id.*

Dr. Tilden makes a feeble attempt to lay blame for this delay on New Jersey authorities. *See* DSMF ¶174, 181 (noting that Plaintiff was a New Jersey prisoner and all specialty care had to be approved by New Jersey prison officials). Although Dr. Tilden made notes in Plaintiff's chart suggesting that New Jersey was responsible for some kind of delay, in reality, New Jersey did not delay anything: Pontiac medical staff did not even submit the referral request for New Jersey's review until May 2, 2013 (again, around the time that Mr. Rodesky's January 7 grievance likely reached the health care unit), and New Jersey responded promptly, within 3 business days. PSMF ¶ 61. New Jersey is not at fault.

Dr. Tilden also attempts to evade liability for this delay by claiming that he had no control over scheduling specialty referrals, but facts in the record support an inference that he should and/or could have taken steps to speed up the referral. In his role as Pontiac's medical director, Dr. Tilden was responsible for overseeing the entire medical program at Pontiac. PSMF ¶ 107. He had specific responsibility for addressing all administrative issues that arise and for ensuring the

timeliness and implementation of appropriate medical care. *Id.* Dr. Tilden saw Mr. Rodesky at frequent intervals during the period of time that he was waiting for his specialty referral so Dr. Tilden knew that the appointment was not happening within a reasonable time period. DSMF ¶¶ 173-194. It was his responsibility to sort out whatever issues were getting in the way of a timely referral (for example, reach out directly to the specialist, as Dr. Sheaff would have), but there is no indication he did anything along those lines.[3] Based on these facts, a jury could find that Dr. Tilden was deliberately indifferent by delaying Plaintiff's referral to outside specialty care.

### b. Delay in Getting Appropriate Medical Care When Plaintiff's Foot Reopened Yet Again in 2014

In May-June 2014, Plaintiff underwent a second round of serious surgical interventions for his diabetic foot ulcer, this time under the close supervision of an orthopedic surgeon at UIC, during which time he was housed in Pontiac's infirmary. PSMF ¶¶ 78-83. When the wound finally healed, in September 2014, he was discharged back to the cell house. *Id.* ¶ 83.

Soon afterward, however, in early November 2014, skin ulceration re-appeared at the surgical site, and Plaintiff desperately sought out medical attention. *Id.* ¶ 87. He showed his foot to med techs in his cell house and repeatedly requested that they bring the issue to Dr. Tilden's attention, to no avail. *Id.* ¶¶ 87-96. He was not seen by a medical professional until late December 24, at which point he was again in need of debridement, *id.* ¶ 96, and he was not seen again by a specialist until January 14, 2015, *id.* ¶ 97.

In the following months, from January 2015 to July 2015, Plaintiff's condition progressively worsened, he became progressively ill, and was admitted to the hospital several

---

[3] It also bears mention that once Plaintiff was under the care of outside specialists in 2013 and 2014, delays and gaps in his follow up care (that Dr. Tilden was responsible for coordinating) persisted. *See* PSMF ¶¶ 67-78, 80-82.

times. *Id.* ¶¶ 98-106. Although he was under a specialist's care during this time, again his course of treatment was marked by lack of timely follow up. *See id.* ¶¶ 98-106. In July 2015 he became septic and needed a below knee amputation in order to control the infection. *Id.* ¶106.

As Defendants observe, Plaintiff's foot ulcer was healed in September 2014 when he was discharged from the Pontiac infirmary, Doc. 90 at 51, but this fact does not exonerate Dr. Tilden. At this point in time, Plaintiff was as very high risk of developing another foot ulcer, in light of his past complicated course with foot ulcers. PSMF ¶¶ 14, 15, 66, 108. Predictably, in early November 2014, Plaintiff noted cracked skin around the surgical site on his right foot. *Id.* ¶ 87. At this point, a prompt medical response was critically important. *Id.* ¶ 66, 90. Plaintiff brought the issue to the attention of med techs and nurse that worked in his cell house in order to get Dr. Tilden's attention. *Id.* ¶ 87. They informed him that they had brought the matter to Dr. Tilden's attention, but Dr. Tilden never saw him. *Id.* ¶¶ 87-88. The medical records show several dates in this time frame where Plaintiff was scheduled for "urgent care" but Plaintiff was never seen on any of those dates. *Id.* ¶¶ 91-93.[4] Over November and December, Plaintiff's ulcer became increasingly worse. *Id.* ¶ 89. On at least one occasion Dr. Tilden was physically present in Plaintiff's cell house conducting medical visits and he planned to see Plaintiff, but he failed to do so. *Id.* ¶ 93. Finally, in late December, a cell house lieutenant ordered officers to take Plaintiff to Pontiac's health care unit and not to bring him back until he was seen by a medical professional. *Id.* ¶ 94. It was only at that point that Plaintiff saw a medical provider for his returned diabetic foot ulcer, at which point he was observed to have scaling necrotic tissue on his "old wound" with fissures, including between the toes. *Id.* ¶ 95.

---

[4] The medical records indicate that Plaintiff's cell house was on lockdown, but Dr. Tilden could have arranged to see Mr. Rodesky in the cell house, which he would do on occasions when someone on lockdown needed medical attention. PSMF ¶¶ 91-93.

Dr. Tilden might argue that he did not have personal knowledge of Plaintiff's foot condition in November and December 2014 because he did not personally see Plaintiff during this period. However, facts in the record support an inference that Dr. Tilden had at least some knowledge that Mr. Rodesky's foot ulcer required renewed medical attention during this period. In addition to the statements that cell house medical staff made to Plaintiff (that they had relayed Plaintiff's concerns to Dr. Tilden), notes indicate several points where Mr. Rodesky was scheduled for urgent care but was simply not seen. Presumably, Dr. Tilden would know when he was scheduled to see someone for "urgent care" but the appointment ended up not happening. In addition, there was at least one occasion in December 2014 where Dr. Tilden was in Plaintiff's cell house making rounds, but did not see Plaintiff.

Furthermore, at the time, Dr. Tilden was responsible for overseeing the entire medical program at Pontiac, with specific responsibilities for ensuring the timeliness and implementation of appropriate medical care and coordinating services of other on-site medical providers. PSMF ¶ 107. Dr. Tilden was aware of the need to closely monitor diabetic foot ulcers because he knew they could "go sour" quickly. *Id.* ¶ 11. Importantly, Dr. Tilden also described Plaintiff as his "number one patient" over the relevant time period because he had so much contact with Plaintiff and because Plaintiff needed so much care. *Id.* ¶ 112. Given his role as Pontiac's medical director, Dr. Tilden very likely had some mechanism set up to ensure that he was notified if/when his "number one patient" was repeatedly reaching out cell house medical staff about a flare up of his diabetic foot ulcer.

There are sufficient facts in the record to support a finding that Dr. Tilden was deliberately indifferent to Plaintiff's serious medical need in November 2014, when Plaintiff's foot ulcer was opening again for the third time.

### 3. Failure to Treat Pain

Just like Dr. Powers, Dr. Tilden can also be found deliberately indifferent by failing to treat Plaintiff's pain. In 2013 and again during October 2014, Plaintiff suffered from a painful medical condition, but his pain was either not treated at all, or treated in an obviously inadequate manner. PSMF ¶¶ 56, 85-86. As noted in Section II.A.3, *supra*, a prison doctor's delay or refusal to treat pain can constitute deliberate indifference. *Rodriguez*, 577 F.3d at 829.

### C. Wexford's Motion for Summary Judgment

Finally, Wexford argues that it is entitled to summary judgement because (1) Plaintiff cannot establish municipal liability against Wexford; and (2) the Seventh Circuit has not acknowledged claims for respondeat superior liability against under Section 1983 against Wexford. Doc. 90 at 55-56.

As to the first of these arguments, Plaintiff does not intend to proceed with a theory of municipal liability against Wexford at trial in this case.

As to the second of these arguments, Plaintiff agrees that this Court is required to dismiss the claim, however it should be done over Plaintiff's objection, to preserve the issue for appeal. Wexford, a private corporation acting under color of state law, should be liable under § 1983 for the conduct of its employees acting within the scope of their employment. Of course, Seventh Circuit law still requires that § 1983 deliberate indifference claims against private medical corporations like Wexford be supported by proof of a "custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014). *But see id.* at 789 (suggesting that "fresh consideration" of § 1983 *respondeat superior* liability for companies like Wexford is necessary).

The court in *Shields* discussed the many reasons supporting the imposition of *respondeat superior* liability under § 1983 for companies like Wexford: (a) unlike municipalities, private corporations acting under color of state law have a profit incentive that makes vicarious liability appropriate, (b) vicariously liability is not foreclosed by the history or text of § 1983, which requires only that a defendant "cause" a constitutional tort; and (c) federal law already distinguishes between municipalities and private corporations acting under color of state law, including in the context of qualified immunity and punitive damages. *Id.* at 793-95. Plaintiff believes that the Seventh Circuit's discussion in *Shields* persuasively demonstrates why Wexford should be vicariously liable under § 1983 for the conduct of its employees acting within the scope of their employment, and notes that question of whether Wexford can be held liable under a theory of respondeat superior continues to be debated among the judges in the Seventh Circuit. *See Gaston v. Ghosh*, 920 F.3d 493 (7th Cir. 2019). Plaintiff reserves his right to make such arguments on appeal, to the *en banc* Seventh Circuit, or to the Supreme Court, and to revisit this claim should an intervening decision from the Seventh Circuit or the Supreme Court adopt the position advocated in *Shields*.

## Conclusion

For the foregoing reasons, the Wexford Defendants' motion for summary judgment should be denied as to Dr. Powers and Dr. Tilden.

Respectfully Submitted,


/s/ Elizabeth Mazur
Attorney for the Plaintiff

Alan Mills
Elizabeth Mazur
Nicole Schult
Uptown People's Law Center
4413 N. Sheridan
Chicago, IL 60640
(773) 769-1411


## CERTIFICATE OF SERVICE

I, Elizabeth Mazur, an attorney, certified that I served a copy of this pleading on all counsel of record by filing the same through the CM/ECF system.


/s/ Elizabeth Mazur